**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                     )
BLANCA ZELAYA                                        )
                                                     )
            Plaintiff,                               )
                                                     )
v.                                                   )        Civil Action No. 1:07-cv-02311-RCL
                                                     )
UNICCO SERVICE COMPANY, *et al.*,                    )
                                                     )
            Defendants.                              )
_____)

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO DEFENDANT CARLOS ALARCON'S MOTION TO DISMISS**

        Plaintiff Blanca Zelaya, through undersigned counsel, respectfully submits her

Memorandum of Points and Authorities in Opposition to Defendant Carlos Alarcon's Motion to

Dismiss Counts Two and Four of the Complaint (June 26, 2008) (Doc. No. 16) ("Def. Mot.").

This is an action for egregious sexual harassment, sex discrimination, and retaliation in violation

of Title VII and the District of Columbia Human Rights Act ("DCHRA").

        This Court should deny Defendant Alarcon's Motion to Dismiss in its entirety.  First,

defendant Alarcon is not named as a defendant in all counts, but only in Counts II and IV of Ms.

Zelaya's complaint.  Therefore, defendant's motion to dismiss Counts I, III, and V is moot.

Second, under § 2-1403.16 of the District of Columbia Code, as amended, Ms. Zelaya's DCHRA

charge claiming sexually hostile work environment was timely filed, since the one year statute of

limitations was tolled while her complaint was pending with the District of Columbia Office of

Human Rights ("DCOHR").  Further, all discriminatory and retaliatory actions by defendant

Alarcon are within the scope of this lawsuit because the continuing violations doctrine applies to

Ms. Zelaya's hostile work environment claims.  See National R.R. Passenger Corp. v. Morgan,

1

536 U.S. 101, 117 (2002).  As set forth in more detail below, defendant's support for his argument to the contrary stems from cases decided prior to the amendments made to the DCHRA in 2002.  Third, under the recent U.S. Supreme Court decision in <u>Bell Atlantic v. Twombly</u>, 550 U.S. __, 127 S. Ct. 1955, 1964-65 (2007), Ms. Zelaya's allegation that the defendants made defamatory statements to her new employer are more than sufficient, because the only plausible explanation is that it was a UNICCO employee made the defamatory statements.  Fourth, defendant Alarcon can be named as an individual defendant in this case because the DCHRA allows for claims against individual employees if they act on behalf of an employer.  <u>Purcell v. Thomas</u>, 928 A.2d 699, 714 (D.C. 2007).

## I.  FACTUAL BACKGROUND.

Ms. Zelaya worked for defendant UNICCO as a custodian at 1200 K Street in Washington, D.C., starting in 2004.  Compl. ¶ 9.  Throughout her employment, defendant Carlos Alarcon subjected Ms. Zelaya to egregious and systematic sexual harassment which ultimately created a hostile work environment.  When Ms. Zelaya complained, defendant Alarcon retaliated against her.  Ms. Zelaya was pregnant when defendant Alarcon began sexually harassing and retaliating against her, and his actions caused Ms. Zelaya extreme emotional and physical stress, resulting in the premature birth of her son.  <u>Id.</u> ¶ 14.

On or about January 4, 2005, defendant UNICCO promoted defendant Carlos Alarcon to the position of Building Operations Manager at 1200 K Street.  <u>Id.</u> ¶ 13.  As Manager, defendant Alarcon supervised Ms. Zelaya.  <u>Id.</u>  Almost immediately after he became Ms. Zelaya's supervisor, defendant Alarcon began making offensive and unwelcome sexually explicit comments and sexual advances toward her, including running his hands down her back or against her shoulders and repeatedly commenting on her appearance.  <u>Id.</u> ¶ 15.

2

Throughout the spring of 2005, defendant Alarcon repeatedly cornered Ms. Zelaya in a storage room while she was working.  <u>Id.</u> ¶¶ 16-17.  Once he had trapped her in the storage room, defendant Alarcon would molest her and put his hands all over her body.  <u>Id.</u>  On one occasion in March of 2005, defendant Alarcon trapped Ms. Zelaya in the storage room and told her he found pregnant women "hot" and "horny," and that if she did not have someone who could satisfy her sexually that he would be happy to do it for her.  <u>Id.</u> ¶ 17.

Defendant Alarcon's sexual advances made Ms. Zelaya extremely uncomfortable and fearful for her safety and the safety of her unborn child.  <u>Id.</u> ¶ 19.  She made clear to defendant Alarcon that his sexual advances were offensive and unwelcome, and that if he did not stop touching her and making comments about her body, she would report him to UNICCO supervisors.  <u>Id.</u> ¶ 17.  Defendant Alarcon ignored her protests and made clear to her that he would continue to harass her because UNICCO's attorneys would protect him.  <u>Id.</u>

UNICCO employees at 1200 K Street regularly witnessed defendant Alarcon's sexual harassment of Ms. Zelaya.  <u>Id.</u> ¶ 20.  Indeed, other employees would warn Ms. Zelaya when Alarcon was in the building, so that she could hide from him.  <u>Id.</u>  In the Spring of 2005, defendant Alarcon enlisted the support of UNICCO's Site Manager, defendant Oscar Argueta, to monitor Ms. Zelaya's actions and whereabouts.  <u>Id.</u> ¶ 21.  In collaboration with defendant Alarcon, defendant Argueta unsuccessfully attempted to have Ms. Zelaya terminated.  <u>Id.</u> ¶ 22.

During the last trimester of Ms. Zelaya's pregnancy, in March of 2005, defendants UNICCO and Alarcon retaliated against her for protesting Alarcon's advances by cutting off her health insurance.  <u>Id.</u> ¶¶ 24, 27.  When Ms. Zelaya informed Alarcon that her health insurance had been cancelled, he falsely claimed that there was nothing he could do to restore her coverage.  <u>Id.</u> ¶ 25.  In April 2005, Ms. Zelaya's union representative requested that UNICCO

3

restore her health insurance, but defendants, including defendant Alarcon, ignored the request. Id. ¶ 26. Ms. Zelaya paid for most of her medical expenses out-of-pocket during the last stages of her pregnancy, because UNICCO refused to restore her health coverage. Id. ¶ 29.

The stress from defendants' harassment took a severe toll on Ms. Zelaya's health both during and after her pregnancy. Id. ¶ 28. As a result, starting on May 18, 2005, she took extended leave from her job and gave birth to her child prematurely. Id. ¶ 28.

Ms. Zelaya returned to work in August of 2005, after recovering from the difficult birth of her child. Defendant Alarcon resumed his campaign of sexual harassment. Id. ¶ 31. Ms. Zelaya again repeatedly told defendant Alarcon that his advances were unwelcome and offensive, but he continued his comments and advances, and warned her that he would fire her if she reported him. Id. ¶¶ 31, 33.

At this point, defendant Alarcon and Carlos Fernandez hatched a plan to terminate Ms. Zelaya in retaliation for her claims of sexual harassment by transferring her to a building where UNICCO would soon lose its contract. On March 15, 2006, defendant Fernandez issued trumped-up disciplinary notices claiming that a resident of the building had complained about Ms. Zelaya's work. Id. ¶¶ 35-37. The notices were false and clearly intended to retaliate against Ms. Zelaya for her claims of sexual harassment. The customer, who allegedly complained about her, later wrote a letter disavowing any problems with Ms. Zelaya and her work, yet defendant Fernandez refused to revoke the notices. Id. ¶¶ 39, 40.

Defendant Alarcon's harassment continued throughout the Spring of 2006. On one occasion he told Ms. Zelaya that he thought she had a "pretty ass" and it was "too bad" it was not his. Id. ¶ 41-45. He also told her to keep her mouth shut about the harassment, and again warned her that he would have her fired if she did not accede to his sexual advances. Id.

4

Defendants Fernandez and Alarcon continued to pressure Ms. Zelaya and threaten her with further retaliation if she complained.  Id.

On April 14, 2006, Iva Burwood, a Human Resources representative from UNICCO, met with Ms. Zelaya to discuss defendant Alarcon's harassment.  Id. ¶ 46.  Ms. Burwood does not speak Spanish and Ms. Zelaya has limited English proficiency, but Ms. Burwood refused to provide an interpreter or to allow Ms. Zelaya's attorney to be present.  Id. ¶¶ 47-48.  Ms. Burwood intended on intimidating Ms. Zelaya by meeting with her without an interpreter or her attorney, which was known by the company.  Ms. Burwood also pressured Ms. Zelaya by asking her repeatedly and abusively if she had told the truth about defendant Alarcon's harassment, and told Ms. Zelaya that she would get in trouble if she had lied.  Id. ¶ 49.

Defendant UNICCO's retaliation escalated after Ms. Zelaya's meeting with Ms. Burwood, and became even worse after she filed a discrimination complaint against the defendants with the D.C. Office of Human Rights ("DCOHR") on April 14, 2006.  Id. ¶ 50. Even after Ms. Zelaya informed UNICCO that she was represented by counsel, defendant retaliated further against her by attempting to meet with her without her attorney present.  Id. ¶¶ 54-58.

Defendant UNICCO's retaliation culminated in its termination of Ms. Zelaya by transferring her to another building, where UNICCO knew it would soon lose the maintenance contract.  Id. ¶¶ 63-64.  Indeed, shortly after defendant UNICCO transferred Ms. Zelaya to the new building, it lost the contract on the building, and a new company, Cavalier, took over the contract.  Id. ¶ 66.  Cavalier then constructively discharged Ms. Zelaya by offering her a work schedule that was too late in the day to allow her to take care of her son, even though other positions were available.  Id. ¶¶ 68-69.  Upon information and belief, defendants, including

5

Alarcon, made false and defamatory statements about Ms. Zelaya, which caused Cavalier to offer her the untenable work schedule, so she would be compelled to leave. <u>Id.</u> Cavalier did so even though Ms. Zelaya was senior to the two other maintenance employees who were given preferable schedules. <u>Id.</u> ¶ 68.

Ms. Zelaya filed a discrimination complaint with the DCOHR on April 18, 2006, claiming that the defendants, including Alarcon, sexually harassed, discriminated, and retaliated against her, which created a hostile work environment. <u>Id.</u> ¶ 50. Ms. Zelaya's DCOHR charge was cross-filed with the Equal Employment Opportunity Commission ("EEOC"). <u>Id.</u> Ms. Zelaya withdrew the complaint from DCOHR on November 21, 2007 and requested a Right to Sue Notice from the EEOC, which the EEOC issued on December 5, 2007. On December 21, 2007, Ms. Zelaya filed the complaint in this matter. Ms. Zelaya's initial charge tolled the running of the statute of limitations on her allegations of discrimination that occurred within the year prior to date she filed the charge. The statute of limitations began to run again when the DCOHR granted her request to withdraw her charge from the administrative process on November 14, 2007. She filed suit five weeks later, on December 21, 2007. Ms. Zelaya's complaint therefore incorporates all of defendant Alarcon's numerous discriminatory and retaliatory acts after June 21, 2005.

## II. <u>STANDARD OF REVIEW.</u>

A motion to dismiss for failure to state a claim upon which relief can be granted is viewed with disfavor and is rarely granted. <u>Doe v. United States Dep't of Justice</u>, 753 F.2d 1092, 1102 (D.C. Cir. 1985). On a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court accepts as true all of the factual allegations in the complaint. <u>Erickson v. Pardus</u>, 551 U.S. __, 127 S. Ct. 2197, 2200 (2007) (per curiam); <u>Bell Atlantic Corp. v. Twombly</u>,

550 U.S. __, 127 S. Ct. 1955, 1964-65 (2007).  The court construes the complaint liberally in the plaintiff's favor and grants the plaintiff the benefit of all inferences that can be derived from his or her well plead allegations.  Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994); see also Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002); Sparrow v.United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).  Any ambiguities or doubts concerning the sufficiency of the claim must be resolved in favor of the Plaintiff.  Doe, 753 F.2d at 1102.  There is no probability of success requirement at the pleading stage.  Bell Atlantic Corp., 127 S. Ct. at 1965, but "something beyond ... mere possibility ... must be alleged[.]"  Id. at 1966.  The facts alleged in the complaint must be sufficient to merely "to state a claim for relief that is plausible on its face."  Id. at 1274.

### III.  LEGAL ARGUMENT.

#### A.  Ms. Zelaya named defendant Alarcon in her charge of discrimination.

Ms. Zelaya filed her initial charge of discrimination with the DCOHR on April 14, 2006.  The DCOHR's "Complaint Form" does not provide a space to list individual respondents, but states that the factual portion of the complaint should "list… the name(s) of the person(s) who discriminated against you…"  See Plaintiff's Complaint Form and accompanying Declaration of Blanca Zelaya (April 14, 2006) (attached and incorporated herein as Exhibit 1).  Ms. Zelaya specifically and repeatedly named defendant Alarcon in the declaration attached to her initial charge and in the subsequent amendments to that charge.  See, id., Exhibit 1 (Declaration of Blanca Zelaya, at ¶¶ 5, 8).  Defendant's assertion that Alarcon was not named as a respondent is therefore plainly wrong.  Def. Mot. at 3, 8.

**B.  Ms. Zelaya timely filed her DCHRA claims in this Court.**

Defendant Alarcon's earlier discriminatory and retaliatory acts are also within the scope of this lawsuit because the continuing violations doctrine applies to Ms. Zelaya's hostile work environment claims.  See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117 (2002). Under Morgan, the continuing violations theory applies when the defendants' unlawful conduct "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"  Id. at 117.  The claim's "very nature involves repeated conduct," and it is based on the "cumulative effect of individual acts."  Id. at 115.

The D.C. Court of Appeals adopted the Morgan continuing violations analysis in Lively v. Flexible Packaging Ass'n, 830 A.2d 874 (D.C. 2003), which also construed the D.C. Human Rights Act.  The Lively Court concluded that the continuing violations theory applies when the plaintiff is subjected to "one unlawful employment practice" continuing over time, id. at 890, and that a single act occurring within the limitations period is enough to make "'the entire time period'" count "'for the purposes of determining liability.'"  Id. (quoting Morgan, 536 U.S. at 117).

Here, defendant Alarcon's sexual harassment campaign began when defendant UNICCO hired him, and ended when Ms. Zelaya no longer worked for defendant UNICCO.  Therefore, any one of the defendant's numerous harassing and retaliatory acts occurring after June 21, 2005 is enough to make "'the entire time period of the hostile environment'" count "'for the purposes of determining liability.'"  Id.

**1.  The DCHRA provides for tolling during the administrative process.**

From its inception until 1997, the DCHRA provided for a one year statute of limitations. Employees could file administrative charges, but filing an administrative charge had no effect on

the statute of limitations for a civil action.  See Historical and Statutory Notes to D.C. Code § 2-

1403.16 (formerly cited as D.C. Code 1981 § 1-2556).

In the Human Rights Amendment Act of 1997 (Act 12-143), the D.C. Council amended

the DCHRA to add a tolling provision during the DCOHR administrative process.  In 2002, that

provision was further amended to provide for tolling during any administrative process, whether

before DCOHR or EEOC.  The private right of action provision now states in relevant part:

> A private cause of action pursuant to this act shall be filed in a court of
> competent jurisdiction within 1 year of the unlawful discriminatory
> practice, or the discovery thereof  . . . The timely filing of a complaint
> with the Office… **shall toll the running of the statute of limitations
> while the complaint is pending**.

D.C. Code § 2-1403.16(a) (formerly codified as D.C. Code 1981 § 1-2556(a)) (emphasis added).

Therefore, Ms. Zelaya's charge of discrimination with the DCOHR tolled the statute of

limitations on all of her allegations of discrimination that occurred within the year prior to date

she filed the charge.

Judge Lamberth of this Court, citing Griffin, recently recognized that "the one-year

limitations period is tolled when a complaint is pending before the District of Columbia Office of

Human Rights." Bailey v. Verizon Communications, Inc., 544 F. Supp. 2d 33, 38 (D.D.C.

2008).  Moreover, the District of Columbia Court of Appeals recently reiterated in Esteños v.

PAHO/WHO Federal Credit Union that the one year statute of limitation under the DCHRA is

tolled once a claim is filed administratively with either the EEOC or the DCOHR.  No. 04-CV-

1093, ___A.2d___, 2008 WL 2605060, at *4 (D.C. July 03, 2008) (attached and incorporated

herein as Exhibit 2).  Thus, "[t]he DC OHR's and EEOC's procedural requirements are to be

read broadly and flexibly in the employee's favor in light of their remedial purposes and because

they are designed for lay persons." Id. The DC Court of Appeals should be given deference in interpreting a DC statute such as the DC Human Rights Act.

Defendant wrongly relies on cases decided before the DCHRA was amended to argue that Ms. Zelaya's DCHRA claims are time barred. Specifically, defendant relies on five cases decided before the DCHRA was amended on October 23, 1997. Def. Mot. at 5, citing Anderson v. United Safe Deposit Co., 552, A.2d 859 (D.C. 1989); Davis v. Potomac Elec. Power Co., 449 A.2d 278 (D.C. 1982); Katradis v. Dav-El of Washington, D.C., 846 F.2d 1482 (D.C. Cir. 1988); Def. Mot. at 7, citing Weiss v. Int'l Bhd. of Elec. Workers, 759 F. Supp. 144 (D.D.C. 1990); Clifton v. Fed. Nat'l Mortgage Ass'n, 1998 WL 419741 (D.D.C. 1998). These pre-amendment cases are clearly not relevant to this Court's analysis.

Defendant also cites Kamen v. Int'l Bhd of Elec. Workers, 505 F. Supp. 2d 66 (D.D.C. 2007) and Coleman v. Potomac Electric Power Co., 2004 WL 2348144 (D.C. Cir. 2004) affirming 310 F. Supp. 154 (D.D.C. 2004). In both cases, the courts mistakenly relied on the same pre-1997 precedent defendants use here, specifically Anderson, and incorrectly held that the DCHRA statute of limitations was not tolled during the administrative process. Coleman is an unreported summary affirmance, which cannot be used as precedent. Plaintiff Coleman was pro se in this Court and in the D.C. Circuit. Coleman v. Potomac Electric Power Co., Civ. Act. No. 1:03CV01202 (D.D.C.). Coleman has been cited for this point exactly once, in Kamen. Kamen, 505 F. Supp. 2d at 76.

The unambiguous language of the DCHRA is clear, and courts have repeatedly held that the DCHRA's statute of limitations is tolled during the pendency of a claim before an administrative agency. See, generally, Aigret v. Compass Group North America, Inc., et al., C.A. No. 01-CA-1650 (D.D.C. April 15, 2004) (attached and incorporated herein as Exhibit 3).

10

    2. __Voluntary withdrawal of a complaint does not eviscerate the protection of tolling.__

Once filed, a DCHRA charge can end in one of three ways: (1) the employee can

withdraw the complaint; (2) the DCOHR can dismiss the complaint for administrative

convenience; or (3) the DCOHR can reach a conclusion on the merits of the complaint.  D.C.

Code § 2-1403.16(a).[1]  If the complaint filed under the DCHRA is terminated in the manner set

forth in subparts (1) or (2), the employee is entitled to trial de novo.  D.C. Code § 2-1403.16(a)

("where the [DCOHR] has dismissed such complaint on the grounds of administrative

convenience, or where the complainant has withdrawn a complaint, such person shall maintain

all rights to bring suit as if no complaint had been filed.").  See, e.g., Kensil v. Union Labor Life

Insurance Co., C.A. No. 05-CA-7313, at 3 (D.C. Super. Ct. July 31, 2006); Adams v. Howard

University, C.A. No. 00-CA-7610 (D.C. Super. Ct. April 27, 2004) (DCHRA statute of

limitations tolled while "complaint is pending before the EEOC"); Aigret, C.A. No. 01-CA-1650

(Exhibit 3); Vitikacs v. The American Legion, 2003 WL 22004935 *3, n. 2 (D.C. Super. Ct. June

8, 2003).

Employees were also entitled to trial de novo before the 1997 amendments.  See, e.g.,

Parker v. National Corp. for Housing Partnerships, 697 F. Supp. 5 (D.D.C. 1988) (aggrieved

party who has filed complaint with DCOHR may file complaint in a court of competent

jurisdiction only when DCOHR dismisses complaint on ground of administrative convenience or

when complainant withdraws complaint before DCOHR renders administrative decision); Held

v. National R.R. Passenger Corp., 101 F.R.D. 420 (D.D.C. 1984) (where employee withdrew

---

[1] If the DCOHR reaches a conclusion on the merits, the employee can appeal to the D.C. Court of Appeals but cannot obtain a trial de novo.  D.C. Code § 2-1403.14 (authorizing judicial review of DCOHR decisions in accordance with D.C. Code § 2-510(a): "The Court shall hear and determine all appeals upon the exclusive record for decision before the Mayor or the agency").

discrimination complaint which he had filed with the DCOHR, he was entitled to maintain judicial action); Brown v. Capitol Hill Club, 425 A.2d 1309 (D.C. 1981) (where DCOHR dismisses a complaint on grounds of administrative convenience, or where the complainant withdraws his complaint before an administrative decision is rendered, such person retains the right to file a complaint in court).

The statutory basis for de novo litigation of withdrawn claims is D.C. Code § 2-1403.16(a), which states in pertinent part:

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction for damages and such other remedies as may be appropriate, unless such person has filed a complaint hereunder; **provided, that where the [D.C.] Office [of Human Rights] has dismissed such complaint on the grounds of administrative convenience, or where the complainant has withdrawn a complaint, such person shall maintain all rights to bring suit as if no complaint had been filed.** (emphasis added).

Defendant twists the meaning of this sentence to suggest that it eviscerates the tolling provision. Def. Mot. at 6-7. Tolling is irrelevant to appeals from administrative decisions because the D.C. Court of Appeals has set a thirty (30) day period for filing an appeal. D.C. Code § 2-510 (D.C. App. Rule 26). If the tolling provision has no effect when the employee withdraws the complaint, and has no effect when the DCOHR dismisses the complaint for administrative convenience, then the tolling provision is of no use to anyone. Counsel is aware of no decision, and defendant has not cited any such decision, adopting defendant's reading of D.C. Code § 1403.16(a). As noted above, courts have repeatedly held that, to the contrary, the tolling provision is effective. See, e.g., Esteños, 2008 WL 2605060, at *4 (Exhibit 2); Vitikacs, 2003 WL 22004935 *3 n. 2; Adams, C.A. No. 00-CA-7610; Kensil, C.A. No. 05-CA-7313 at 3.

**3.** **Rules of statutory construction also favor allowing Ms. Zelaya's DCHRA claims to go forward.**

The meaning of the DCHRA's tolling provision and entitlement to trial <u>de novo</u> is clear. But to the extent that the DCHRA's meaning is even arguably ambiguous, this Court should follow the rules of construction providing that, "[w]here two constructions as to the limitations period are possible; the courts prefer the one that gives the longer period in which to prosecute the action… 'If there is any reasonable doubt in a statute of limitations problem, the court will resolve the question in favor of the complaint standing and against the challenge.'" <u>Lively v. Flexible Packaging Assoc</u>., 830 A.2d 874, 877 (D.C. 2003) (<u>en banc</u>) (quoting <u>Simpson v. District of Columbia Office of Human Rights</u>, 597 A.2d 392, 401 (D.C. 1991)).  District of Columbia courts adopt a construction that favors the complaining party in order to reflect the importance of the civil rights secured by the DCHRA, and the importance of a private suit in helping to fulfill the Act's commitment to civil rights.  <u>See</u> <u>Simpson</u>, 597 A.2d at 402; <u>see also</u> <u>Executive Sandwich Shoppe, Inc., v. Carr Realty Corp</u>., 749 A.2d 724, 731 (D.C. 2000) ("[w]e have specifically stated on several occasions that the DCHRA is a remedial civil rights statute that must be generously construed.").  Thus, if this court were to find any ambiguity in the DCHRA's tolling provision and right to trial <u>de novo</u>, it should still construe this provision in Ms. Zelaya's favor and find that her complaint was timely filed.

**C.** **Ms. Zelaya's allegation that she was defamed meets the Twombly standard.**

Contrary to defendant's claim that Ms. Zelaya has not met the pleading standard on her defamation claim against defendant Alarcon, she easily meets the standard set forth in the U.S. Supreme Court in <u>Bell Atlantic v. Twombly</u>.  A plaintiff only needs to provide the grounds for his entitlement which goes beyond "labels and conclusions" and the "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the

13

complaint's allegations are true." <u>See</u> <u>Bell Atlantic Corp. v. Twombly</u>, 127 S. Ct. at 1964-65;

<u>see</u> <u>also</u> <u>Papasan v. Allain</u>, 478 U.S. 265, 286 (1986). <u>See</u> <u>generally</u> 5 Wright & Miller, <u>Federal</u>

<u>Practice and Procedure</u> § 1216, at 235-36 (3d ed.2004) ("[T]he pleading must contain something

more … than … a statement of facts that merely creates a suspicion [of] legally cognizable right

of action").

Thus, Ms. Zelaya's allegations of defamation meet the standard set out in <u>Twombly</u>,

because the actions surrounding Ms. Zelaya's constructive discharge from Cavalier make it more

than plausible that her employment status would be affected by defendant Alarcon's negative

statements. First, UNICCO transferred Ms. Zelaya to 2550 M Street with the knowledge that the

company would soon lose the maintenance contract for that building, effectively setting Ms.

Zelaya up for termination. <u>See</u> Complaint, ¶ 64. This fact was confirmed by two UNICCO

employees who worked at 2550 M Street, Fredisvinda Saravia and Jose Ramos. <u>Id.</u> ¶ 65. Once

Cavalier took over the contract for the building, Cavalier hired defendant Argueta as an on-site

manager, the former UNICCO employee with whom Alarcon conspired to monitor Ms. Zelaya's

actions at the 1200 K Street building and set her up for termination. <u>Id.</u> ¶¶ 66, 67. Cavalier

subsequently offered Ms. Zelaya only a position with a schedule that was too late in the day to

allow her to take care of her son. <u>Id.</u> ¶ 69. Further, despite the availability of three daytime

positions, Cavalier refrained from offering one to Ms. Zelaya. <u>See</u> <u>Id.</u> ¶ 68. Instead, only two of

the slots were given to the two remaining employees from the previous UNICCO contract, Ms.

Saravia and Mr. Ramos, although Ms. Zelaya had more seniority over them. <u>See</u> <u>Id.</u>

Taking into count the well plead allegations in Ms. Zelaya's complaint and all reasonable

inferences from these facts, the only plausible explanation for Cavalier's decision to treat Ms.

Zelaya in a discriminatory and hostile manner is that Alarcon and Argueta defamed Ms. Zelaya

to Cavalier.  Cavalier knew nothing about Ms. Zelaya before taking over the contract for 2550 M Street other than what employees of UNICCO told it.  Moreover, defendant Argueta continued to work at the building after UNICCO transferred her to that building and before Cavalier took over the contract.  Given Argueta's and Alarcon's previous scheme to work together to have Ms. Zelaya fired, it is highly plausible that they would attempt to work jointly to do that after she moved to the new building.  Based on this negative information, Cavalier proceeded to give Ms. Zelaya a position at a time of day that she is not available while another, more suitable position exists.  The Court should therefore hold that Ms. Zelaya can proceed with her defamation claim against defendants UNICCO and Alarcon.

**D.  Ms. Zelaya may hold defendant Alarcon individually liable for discrimination and retaliation under the DCHRA.**

Contrary to defendant's argument that Mr. Alarcon cannot be named as an individual defendant, under the DCHRA, the meaning of "employer" under the DCHRA specifically states that an individual employee can be liable for alleged discrimination or retaliation.  An "employer" is defined as "any person who, for compensation, employs an individual… acting in the interest of such employer, directly or indirectly; and any professional association."  D.C. Code § 2-1401.02(10); Purcell v. Thomas, 928 A.2d at 714.  See also Wallace v. Skadden Arps, Slate, Meagher & Flom, 715 A.2d 873, 887 (D.C. 1998); Cruz-Packer v. District of Columbia, 539 F. Supp. 2d 181, 185 (D.D.C. 2008); Mitchell v. Nat'l R.R. Passenger Corp., 407 F. Supp. 2d 213, 241 (D.D.C.2005); and Lance v. United Mine Workers of America 1974 Pension Trust, 400 F. Supp. 2d 29, 32 (D.D.C. 2005).  In Purcell, the defendant was found individually liable for sexual harassment because of his capacity as President, Chief Operating Officer, controlling shareholder, and direct supervisor of the plaintiff at the company.  See 928 A.2d at 715.  Thus,

15

"[i]n his various capacities, [the defendant] was acting, directly or indirectly, in the interest of [the employer] and hence fell within DCHRA's definition of employer."  See Id.

As applied to the case at hand, defendant Alarcon qualifies as an "employer" under the DCHRA because he served in a supervisory position and acted in the interest of UNICCO.  See Purcell at 714.  Further, defendant Alarcon aided and abetted the discriminatory and retaliatory actions against Ms. Zelaya, which also may hold him liable under the DCHRA.  See D.C. Code § 2-1402-62 ("It shall be an unlawful discriminatory practice for any person to aid, abet, invite, compel, or coerce the doing of any of the acts forbidden under the provisions of this chapter [Chapter 14, Human Rights] or to attempt to do so").  Therefore, Ms. Zelaya can state a claim against defendant Alarcon as an individual and agent of UNICCO who not only created a hostile work environment, but also aided and abetted discriminatory as well as retaliatory conduct during the course of her employment.  Thus, the Court should reject defendant Alarcon's assertions, and find that Ms. Zelaya can proceed in her DCHRA claims against him.

## IV. CONCLUSION.

This Court must deny Defendant's Motion to Dismiss in its entirety because Ms. Zelaya's DCHRA claims were timely filed, her allegation of defamation against Alarcon meets the Twombly standard, and her well pleaded allegation clearly set forth sufficient facts state a DCHRA claim against defendant Alarcon as someone who aided and abetted in UNICCO's discrimination and retaliation against her.

Respectfully submitted,


_____/s/_____
Lynne Bernabei  # 938936
David Wachtel  # 427890
Emily Read  # 492773
Bernabei & Wachtel, PLLC
1775 T Street, N.W.
Washington, D.C. 20009
(202) 745-1942

Attorneys for Blanca Zelaya

DATED: July 17, 2008

EXHIBIT 1

# COMPLAINT FORM

Information required herein will assist OHR staff to determine the nature and extent of discrimination as defined by the Federal/Local Discrimination Laws. Please complete the following form in its entirety and to the best of your knowledge. This form is subject to review and acceptance by the Office of Human Rights.

*Notice of Non-Discrimination*

*In accordance with the D.C. Human Rights Act of 1977, as amended, D.C. Official Code Section 2-1401.01 et seq., (Act) the District of Columbia does not discriminate on the bases of actual or perceived: race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, familiar status, family responsibilities, matriculation, political affiliation, disability, source of income, or place of residence or business. Sexual harassment is a form of sex discrimination, which is also prohibited by the Act. In addition, harassment based on any of the above-protected categories is also prohibited by the Act. Discrimination in violation of the Act will not be tolerated. Violators will be subject to disciplinary action.*

## I. COMPLAINANT

| **Date:** 4/14/06 | **OHR Docket No.:** | **EEOC No.:** |
|---|---|---|

**Name:** Blanca E. Zelaya

**Address:** 655 Girard Street, N.E.

**City/State/Zip:** Washington, DC   20017

| **Tel # (H):** 202-529-0278 | **Tel # (W):** 202-842-1200 |
|---|---|
| **Race:** Hispanic   **Sex:** Female | **Social Security No.:** 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 |
| The Primary Language Spoken in your household: <br> _x_Spanish __Amharic __Chinese __Vietnamese __Korean __Other | **Date of Birth:** 09-11-74 |

**CONTACT PERSON IF YOU CANNOT BE REACHED:**

**Name:** Reina Velasquez

**Address:** 655 Girard Street, N.E.

**City/State/Zip:** Washington, DC   20017

DC Office of Human Rights
441 4th Street, NW, Suite 570N
Washington, DC  20001
202-727-4559 *Fax 202-727-9589
Complaint Form

1

rev 02/06

| **Tel # (H):** 202-529-0278 | **Tel # (W):** 202-842-1200 |
|---|---|

**IF REPRESENTED BY COUNSEL, PLEASE PROVIDE THE FOLLOWING:**

**Name:** Lynne Bernabei          **Telephone/Fax:** 202-745-1942/202-745-2627

**Address:** 1773 T Street, NW, Washington, DC  20009

*Please note: If you are represented by counsel or retain counsel prior to your scheduled Intake interview, the counsel must either (1) be present with you for the duration of your Intake interview, or (2) withdraw his/her appearance from the interview by submitting a letter to the Office indicating that the interview may take place without his/her representation.

## 2. RESPONDENT

**Name of company or organization:**

UNICCO Service Company

**Name and Title of principal officer (i.e. President, Owner, Human Resources Manager):**

Steven Kletjian, Chairman & CEO

**Nature of Business:**
Facility Services including maintenance and cleaning

**Address:**
275 Grove Street

**City/State/Zip:**
Newton, MA  02466

| **Tel #:** 800-283-9222 | **Fax #:** 617-969-2210 |
|---|---|

## 3. BASIS OF COMPLAINT
### The basis is the reason you were treated differently than others outside of your protected class.

**Do you feel you were discriminated against because of your: (Please check appropriate box and provide detail, if necessary.)**

| | | |
|---|---|---|
| ☐  Race _____ | ☒ Sex  Female | ☐ Age _____ |
| ☐  National Origin _____ | ☐ Religion _____ | |
| ☐  Color _____ | ☐ Disability _____ | ☐ Familial Status* |
| ☐  Source of Income* | ☐ Matriculation | ☐ Marital Status |
| ☐  Personal Appearance | ☐ Genetic Information | ☐ Sexual Orientation |
| ☐  Gender Identity or expression | ☐ Place of Residence or Business* | ☐ Political Affiliation |
| ☐  Family Responsibilities | | |

* Please note: Pursuant to the D.C Human Rights Act of 1977, as amended, the "familial status" and "source of income" bases are applicable only when alleging discrimination in housing, public accommodations and educational institutions. The basis of "place of residence or business" is applicable only if alleging discrimination in housing and public accommodations.

DC Office of Human Rights
441 4th Street, NW, Suite 570N
Washington, DC  20001
202-727-4559  *Fax  202-727-9589
Complaint Form

2

rev 02/06

## 4. JURISDICTION

☒ Alleged violation occurred in the District of Columbia.

☒ Alleged violation occurred 365 days or less (6 months or less for D.C. Government Employees).

☒ At least 1 employee (More than 15 employees to cross file with EEOC).

☒ You have not commenced any other action, civil, criminal, or administrative in any other forum based on the same unlawful discriminatory practice described herein.

## 5. AREA OF COMPLAINT

☒ Employment        ☐ Public Accommodation        ☐ Educational Institution

☐ Language Access        ☐ DC Family and Medical Leave Act

## 6. ISSUES
### What action was taken that made you feel you were treated differently?

☐ Family Medical Leave    ☐ Promotion    ☐ Transfer    ☐ Demotion    ☐ Discharge

☒ Retaliation    ☒ Sexual Harassment    ☒ Hostile Work Environment    ☐ Failure to Hire

☐ Equal Pay    ☐ Terms and Conditions    ☐ Failure to Accommodate    ☐ Discipline

☐ Denial of Service ☐ Constructive Discharge ☐ Admission or Admission Fees ☐ Discounts

☐ Crowd Capacity ☐ Personal Identification ☐ Time of day/event ☐ Restrictions/Rules

☐ Credit/Insurance ☐ Complimentary Admission/Guest ☐ Curriculum

☐ Membership Fee/Dues ☐ Program Participation

Other:_____

## 7. DISTRICT OF COLUMBIA GOVERNMENT EMPLOYEES OR APPLICANTS

*Please note: Pursuant to §105 of DCMR Title IV, all District Government employees must first consult an agency EEO counselor within 180 days of the alleged discriminatory act prior to filing with the Office of Human Rights, *unless* the District Government employee is alleging unlawful discrimination based on sexual harassment. The Office of Human Rights cannot process a complaint from a current of former District Government employee unless (1) the employee has received an exit letter from his/her agency EEO Counselor; (2) twenty-one days has passed since the matter was called to the attention of the agency's

DC Office of Human Rights
441 4th Street, NW, Suite 570N
Washington, DC 20001
202-727-4559 *Fax 202-727-9589
Complaint Form                                                    rev 02/06

**EEO counselor and no exit letter has been written; or (3) the employee is alleging unlawful discrimination based on sexual harassment.**

☐    You have filed an informal complaint with an agency assigned EEO Officer/ Counselor.

Counselor's Name:_____

Counselor's Agency: _____

Counselor's Telephone Number:_____

Date Filed: _____ Date of Exit Letter: _____

## 8. EMPLOYMENT
### Time of Hire, Evaluations, Discipline, Termination

Date of Hire:___2001_____ ∙ Title: Janitor_____

Salary at time of hire: _$9.50 per hour___

Date of Last Performance Evaluation: N/A_____

Supervisor/Manager who performed the Evaluation: ____N/A_____

Last Performance Evaluation Rating: ☐Excellent  ☐ Good   ☐ Fair  ☐Poor

Alleged adverse actions taken against you (i.e., written reprimand, suspension, denial of promotion) and the date the action was taken:

Action: written reprimand_____ Date: _3/15/06_____
Action: written reprimand_____ Date: 33/15/06_____

☒    **Current**  or ☐ **Final** position held with Respondent: _Janitor_____
     Salary: $10.10 per hour___

What reason did Respondent give for your ☐**termination** or ☐**denial of promotion**:

☐ Work Performance ☐ Attendance ☐ Insubordination ☐ Gross Misconduct

Date of Termination/Denial of Promotion: _____

## 9. PUBLIC ACCOMMODATION/EDUCATIONAL INSTITUTIONS
### (Only complete section if your complaint deals with discrimination against a public accommodation or educational institution.)

Date of alleged incident: _____

Service you requested: _____

DC Office of Human Rights
441 4th Street, NW, Suite 570N
Washington, DC  20001
202-727-4559  *Fax  202-727-9589
Complaint Form                                    4

rev 02/06

Person who denied your service request:

Name: _____ Title: _____

How is this person different from you (i.e. what is this person's protected basis?):

_____

Have you tried to resolve this matter with the Respondent?  If so, please describe with whom you spoke and their response:

_____

_____

_____

_____

## 10. D.C. FAMILY AND MEDICAL LEAVE ACT
### (Only complete section if your complaint deals with FMLA.)

Have you been employed with this company for at least one (1) year and have worked at least one thousand (1,000) hours?
☐ **YES**   ☐ **NO**

Date(s) you requested: _____
Reason you requested: _____
Person who denied your request: _____
Title: _____

Others who have requested leave: _____

_____

How are these persons different from you: _____

_____

Have you tried to resolve this matter with Respondent?  If so, please describe with whom you spoke and their response:
Name/Title: _____

_____

_____

_____

_____

_____

_____

DC Office of Human Rights
441 4th Street, NW, Suite 570N
Washington, DC  20001
202-727-4559  *Fax  202-727-9589
Complaint Form                                                    rev 02/06

5

## 11. WITNESSES

List whom you feel can corroborate your experience and provide evidence in your support.

Name: Ramon Alberto Gaitan
Title: Day POrter
Telephone: 202-439-3476
What s/he can attest to: Mr. Alarcon's hostile and aggressive behavior towards Ms. Zelaya.

Name: Sarah LaRose
Title: Manager of Building Security
Telephone: 202-842-1230
What s/he can attest to: Mr. Alarcon's hostile behavior towards Ms. Zelaya. Recent statements made by Mr. Alarcon when he is looking for Ms. Zelaya.

Name: Christine DeSantis
Title: Assistant to Building Manager
Telephone: 202-966-7491
What s/he can attest to: Ms. Zelaya has never had a complaint lodged against her by tenants in the building.

Name: Sharon Cheek
Title: Building Tenant
Telephone: 202-329-4000 x3121
What s/he can attest to: She wrote a letter to building management notifying them that she had not filed any complaints against Ms. Zelaya.

## 12. YOUR COMPLAINT

Describe in detail the incident(s) that led you to file a complaint of discrimination. Please list dates as well as the name(s) of the person(s) who discriminated against you in denying employment, promotion, training, goods, services, educational services, etc. If this is a disability-based complaint, please specify whether an accommodation was requested; the person the request was submitted to and the date Respondent was notified of your disability.

Please see accompanying Declaration.

DC Office of Human Rights
441 4th Street, NW, Suite 570N
Washington, DC 20001
202-727-4559 *Fax 202-727-9589
Complaint Form

6

rev 02/06

DC Office of Human Rights
441 4th Street, NW, Suite 570N
Washington, DC  20001
202-727-4559  *Fax  202-727-9589
Complaint Form

rev 02/06

The D.C. Office of Human Rights provides mediation. Mediation is a process in which an acceptable, impartial, third party attempts to assist disputing parties toward a mutual settlement. Two (2) mediators (co-mediators) are assigned to each case as a neutral third party to assist disputants in reaching a mutually acceptable resolution to their problem(s). The mediation process is mandatory and disputing parties design solutions to their own problems.

**Please Note:** In the event the Investigation reveals that your complaint should be dismissed you will receive a letter explaining the reasons for dismissal. Applicable regulations also require the OHR to send a copy of the dismissal notice to the Respondent.

_____          _4-14-06_____
Complainant's Signature                              Date

I, _____, having read the above, state that the responses contained herein are true and correct to the best of my knowledge and belief.

_____
Signature

SUBSCRIBED AND SWORN to before me this _____ day of _____, of 20___.

_____
Notary Signature

My Commission Expires: _____.

### DECLARATION OF BLANCA ZELAYA

I, Blanca Zelaya, this 14th day of April 2006, am submitting this declaration in support of my claims against the UNICCO Services Company ("UNICCO") for sexual harassment, creation of a hostile work environment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e et seq., and against UNICCO and Carlos Alarcon, Operations Manager, for sexual harassment, sex discrimination, and unlawful retaliation in violation of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 1-2501 et seq.

1.      Since 2001, I have been serving as a janitor in the office building at 1200 K Street NW. I was initially employed by P&R Enterprises. UNICCO took over the cleaning contract for the building in December 2004, at which time I became a UNICCO employee. At that time, UNICCO appointed Carlos Alarcon as the building operations manager and supervisor of the two employees responsible for cleaning the building, Ramon Alberto Gaitan and myself.

2.      Almost immediately upon becoming my supervisor, Mr. Alarcon began making sexually explicit comments and sexual advances toward me. These sexual advances and sexual comments, which are offensive and unwelcome, continued, despite my protests. When Mr. Alarcon became my supervisor in December 2005, I was pregnant. He would regularly make comments about my body and my appearance. On one occasion, in March 2005, Mr. Alarcon cornered me in a storage closet, and told me he found pregnant women more "hot" and "horny." He told me that if I did not have someone who could satisfy me sexually that he would be happy to do it for me. Throughout this time, he also touched me in a sexually suggestive manner that made me

extremely uncomfortable, and apprehensive about my safety and that of my unborn child.

He frequently ran his hands down my back or against my shoulders. On more than one

occasion, in February and March 2005, he led me into a storage room on the pretense that

he needed my help to check the inventory supplies, and then proceeded to try to put his

hands all over my body.

3.    I always refused Mr. Alarcon's advances and told him that I wanted him to

stop touching me and making comments about my body or my appearance. I made it

clear to him that his sexual advances were unwelcome and frightening to me. I asked

him to be more respectful of me. I made excuses to get away from him when he cornered

me and I began hiding from him when I knew he was going to be on-site, because he had

made it clear that he was not going to stop harassing me. In March 2005, I told him that

if he did not stop, I would report him. He told me that UNICCO had attorneys and I

could not prove anything. He also threatened me by telling me that he had the power to

get rid of me.

4.    In late March 2005, during the last trimester of my pregnancy, my health

insurance company informed me that I was no longer covered because UNICCO had

stopped making the payments. When I called Mr. Alarcon to inform him that my health

insurance had been cancelled he told me there was nothing he could do for me. The

union to which I belong wrote a memo to the company on April 21, 2005 stating that I

was entitled to health coverage and requesting that it be immediately restored. *See*

*Memo, attached hereto as Exhibit A.* In May 2005, I asked Mr. Alarcon why my health

insurance had been cancelled. He told me "this is happening to you because you did not

give in to me" and that he could not help me. UNICCO did not restore my health

2

coverage until August 2005.

5.    In the spring 2005, Mr. Alarcon enlisted, Oscar Argueta, the full-time on site manager at 1200 K Street to monitor me and report back to him. Mr. Argueta tried to set me up for termination, but in the end was removed from his own job because the building manager (who is not a UNICCO employee) intervened on my behalf.

6.    As a result of the stress and anxiety caused by Mr. Alarcon and by UNICCO I faced significant emotional and physical problems including serious complications with my pregnancy. I gave birth on May 25, 2005, three weeks before my expected due date. I took two months unpaid leave and paid for much of my medical expenses out-of-pocket, because UNICCO did not restore my health coverage until August 2005.

7.    Upon my return to work in August 2005, Mr. Alarcon resumed making comments about my appearance and my body. He told me that he still found me beautiful and not fat. He frequently told me that he thought that when women get pregnant they turn fat and ugly, but that he did not see that in my case. I told Mr. Alarcon that his comments were inappropriate and made me uncomfortable, but he would not take me seriously. He once responded that I am prettier when I keep my mouth shut. As recently as March 24, 2006, Mr. Alarcon commented that he thinks I have a "pretty ass." When he arrives in the building he frequently demands from security, "here I am, where is she" or "I am looking for her ass." On these occasions security calls to warn me that he is in the building and looking for me. His comments and sexually-charged behavior have always and continue to make me nervous and cause my great stress and humiliation.

3

8.      He has now turned to relying on the new on-site manager, Carlos Fernandez, to monitor me.  On March 15, 2006 I was issued two progressive discipline notices and told that I would be fired if anything else happened.  The first notice stated falsely that a customer had complained that I was not cleaning the glass doors in the afternoon, and the second notice claimed falsely that I had harassed a customer by confronting her about her complaint.  The allegations against me that formed the basis for the disciplinary notices were false.  Sharon Cheek, the tenant in the building, who allegedly reported the incidents, wrote a letter disavowing any statements attributed to her.  Ms. Cheek wrote: "In closing, [Blanca] has been very responsible with keep (sic) the double doors clean, she is always friendly, reliable and dependable and she have never approached me in a threatening or confrontational manner." *Letter from S. Cheek to R. Fuller (March 20, 2006), attached hereto as Exhibit B.*

9.      I have cleaned the offices at 1220 K Street for over five years and I have never received a disciplinary notice or had a tenant file a complaint against me.  Mr. Alarcon is retaliating against me because I did not give into his sexual advances, asked him to stop, and threatened to report him.  In fact, Mr. Alarcon made it clear that he would seek to have me fired if I did not respond to his sexual advances.

10.      Because of this harassment and retaliation against me, I have suffered a great deal of pain, anxiety, and humiliation.  I have also suffered financially because UNICCO discontinued my health coverage during the last months of my pregnancy.

4

I declare, this 14th of April 2006, that the forgoing is true and correct to the best of my knowledge, information and belief

BLANCA ZELAYA



**LOCAL 82**

**SEIU**

Stronger Together

VALARIE P. LONG
President

JAIME CONTRERAS
Secretary-Treasurer

LOCAL 82
SERVICE EMPLOYEES
INTERNATIONAL UNION
AFL-CIO, CLC

www.seiu82.org

Washington, D.C.
910 17th Street, N.W.
11th Floor
Washington, D.C. 20006
202.789.8282
Fax: 202.289.4679

Baltimore
609 N. Eutaw Street
Baltimore, MD 21202
410.332.1600
Fax: 410.332.1988

Montgomery County
911 Silver Spring Avenue
Suite 107
Silver Spring, MD 20910
301.562.9301
Fax: 301.562.9617

| Date: | April 21, 2005 |
|---|---|
| To: | Barbara/ Employee Benefits |
| Fax: | 703 527-6402 |
| From: | Vladimir Monge |
| | SEIU Local 82 |
| Re: | Health Coverage for Blanca Zelaya |

Per our conversation today, I am attaching a copy of the Job History of Blanca Zelaya, SSN 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, according to Union records.

Mrs. Zelaya has been a member of this union since 2001 when she started working for P & R at the same location where she currently works. Unicco took over that building on 12/20/04.

In accordance with the Contract, employees don't lose any benefits already accrued. We are aware that Mrs. Zelaya has already faxed to you copies of her pay stubs from the first months of 2004 which by itself proves that she has been a full time worker long before UNICCO took over that building.

If you need further information please call me at 202 789-8282.

Thank you.

**Zelaya - Exhibit A**

March 20, 2006


Mr. Robert Fuller
Property Manager
Trizec
1200 "K" Street, NW
Washington, DC  20005


Dear Mr. Fuller:

Some disturbing comments concerning your employee Blanca E.
Zalaya have come to my attention.  These comments are particular
disturbing to me because it is reported that I said these comments;
and I would like to clear the record on this situation.

On Wednesday, March 15th your Building Manager along with two other
employees from your company were conducting a walk-on site
inspection.  The Building Manager inquired to the services received on
the 12th Floor.  I commented that the services are very good except
that I had a problem with a request I put in twice yesterday.  That
request was someone to come up and clean the double glass doors in
the Receptionist area, where I am located at.  (Some staff had
smeared their fingers on the class doors and it looked pretty messy.)
The reason why my requests went unanswered was according to Tony
Harris of FASD, that request was not forwarded to Trizec.  I also stated
to the Building Manager that this was very unusual because normally
Erica is very reliable and comes up immediately when I have had these
requests in the past.

I told the Building Manager that Erica is friendly, dependable and
responsible and always does a good job.  In the past I have had
trouble with the glass doors being cleaned but since Erica has taken
over that responsibility I have not had any problems.  I also told the
Building Manager that she always come up and check on the glass
doors.  If they need cleaning (because at times they don't), she cleans
them.  If they don't need cleaning she inspects the glass irregardless
just to make sure.  He stated that that was not good enough that she
should clean them irregardless????  I responded back if they don't
need cleaning, then why would the glass doors be cleaned?

**Zelaya - Exhibit B**

He inquired about the 3:00 pm cleaning. I told him I wasn't sure if they were cleaned at 3:00 pm. I never noticed. I do know that the doors are spotless throughout the day, so my assumption is that Erica is checking on the glass doors in the afternoon and cleans them. I reiterated to the Building Manager that Erica is very friendly, reliable, and dependable and she is a very responsible worker.

Any comments that Erica is not reliable, or that she has not performed satisfactory work in regards to cleaning the double glass doors on the 12th floor, did not come from me.

Also it was bought to my attention that I had made a complaint on Wednesday, March 15th that Erica was harassing me in a non-confrontational way. I liked to clear the record on this. I don't know who called but **I never made that phone call.** I did not speak to anyone at Trizec in regards to this. I am not sure who called and used my name but I can assure you it was not me. Erica has never approached me in a non-threatening way nor do I think she ever will. Her personality does not reflect that kind of characteristic trait.

In closing, Erica has been very responsible with keep the double doors clean, she is always friendly, reliable and dependable and she has never approached me in a threatening or confrontational manner.

If you have any questions, please feel free to give me a call at (202) 326-4000 x3121.

Sincerely,

Sharon D. Cheek

Westlaw.

--- A.2d ----
--- A.2d ----, 2008 WL 2605060 (D.C.)
**(Cite as: --- A.2d ----, 2008 WL 2605060 (D.C.))**

Page 1

Estenos v. PAHO/WHO Federal Credit Union
D.C.,2008.
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN
RELEASED FOR PUBLICATION IN THE
PERMANENT LAW REPORTS. UNTIL
RELEASED, IT IS SUBJECT TO REVISION OR
WITHDRAWAL.

District of Columbia Court of Appeals.
Juan R. ESTEÑOS, Appellant,
v.
PAHO/WHO FEDERAL CREDIT UNION,
Appellee.
PAHO/WHO Federal Credit Union, Cross-Appellant,
v.
Juan R. Esteños, Cross-Appellee.
**Nos. 04-CV-1093, 04-CV-1679.**

Argued Sept. 13, 2005.
Decided July 3, 2008.

Appeal and Cross-Appeal from the Superior Court of
the District of Columbia, (01-CA-9125) (Hon.
Natalia M. Combs Greene, Trial Judge).

James E. Rubin, with whom Mindy G. Farber was on
the brief, for appellant.
F. Joseph Nealon, with whom Jeffrey W. Larroca and
Kirsten E. Keating were on the brief, for appellee.
Emmett B. Lewis and Victor Tabak appear on the
brief for Washington Lawyers' Committee, as amicus
curiae on behalf of appellant.

Before RUIZ, Associate Judge, and STEADMAN
and SCHWELB,[FN*] Senior Judges.

> FN* Judge Schwelb was an Associate Judge
> of the court at the time this case was argued.
> His status changed to Senior Judge on June
> 24, 2006.

RUIZ, Associate Judge:
*1 Juan R. Esteños, in alleging discrimination against
his former employer, presents an issue of first

impression: does the District of Columbia Human
Rights Act, D.C.Code § 2-1401.01 et seq. (2001)
("DCHRA"), allow an employee to initially raise a
claim of national origin discrimination on evidence of
an English proficiency requirement? We hold that it
does. We also hold that timely filing a claim with the
U.S. Equal Employment Opportunity Commission
("EEOC"), which in turn cross-files with DCHRA,
tolls the time for filing a private cause of action under
D.C. law. Accordingly, we reverse the trial court's
grant of summary judgment for appellee and remand
the case for further proceedings.

## I. Background

Before immigrating to the United States, Juan
Esteños was an auditor and accountant in his native
Perú. While he initially sought similar work in this
country, he instead settled for a position as an office
clerk at PAHO/WHO-FCU, the employee credit
union for the UN-affiliated Pan-American Health
Organization and World Health Organization. At the
time, Mr. Esteños had only completed a basic class in
English, and his grasp of the language was
rudimentary. According to Mr. Esteños, his job
interview, in January 2000, was conducted entirely in
Spanish by the general manager (then-CEO Carla
Decker), the manager of operations (Pablo
Hernandez) and the finance manager (unidentified),
who are bilingual. Although appellant testified that
Ms. Decker told him that in order to progress to a
more advanced position he "should continue studying
English," she, who did not remember having
interviewed Mr. Esteños, also did "not recall any
specific conversations with Mr. Esteños regarding his
ability to speak English or Spanish."

The parties dispute whether the office clerk position
required English proficiency at the time Mr. Esteños
was hired. With its motion for summary judgment,
PAHO/WHO-FCU submitted a document labeled,
"Job Description-Office Clerk," which names Mr.
Esteños as the office clerk, yet lists the following
requirements: "High School diploma. Banking
experience desired. *Very good knowledge of English
and Spanish.*" (emphasis added). Appellant contends
that since it is undisputed that he did not have a "very
good knowledge of English" at the time he was hired,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----
--- A.2d ----, 2008 WL 2605060 (D.C.)                                                   Page 2
**(Cite as: --- A.2d ----, 2008 WL 2605060 (D.C.))**

the language requirement it identifies was either ignored or added only after he was hired. PAHO/WHO-FCU cites Carla Decker's deposition testimony as proof that the requirement pre-dated appellant's hiring. In her deposition, Ms. Decker acknowledges the requirement for English fluency in the position description, but in describing the duties of the office clerk, mentioned only two tasks that could require English reading comprehension-reading notes that came with checks deposited with the credit union or messages that were added to customers' accounts. She also testified that, as office clerk, Mr. Esteños did not have to deal with the CEO verbally (in her words, "to no extent"), and that Mr. Esteños communicated with his coworkers in Spanish. As concerns his knowledge of English, Ms. Decker testified that she had "spoken to [appellant] in English" at staff meetings.

*2 In April 2000, after a probationary period, appellant received a positive evaluation from his immediate supervisor, Pablo Hernandez, the Member Services Manager. According to the evaluation, appellant's performance was "highly regarded," and appellant was an "eager learner" whose "accomplishments ... [were] noteworthy." The evaluation concluded with the expectation that appellant's knowledge of the credit union's products would be "develop[ed]" and that his work responsibilities would be increased. There was no mention of his lack of English proficiency or of any resulting deleterious impact on his ability to perform his assigned work. As a result of having successfully completed the probationary period, appellant received a salary increase. That happy state of affairs did not last long, however.

In August 2000, Leonard Supchak, who had been the credit union's CEO some years before Ms. Decker assumed the role, again became CEO. Later that month, Mr. Supchak, who does not speak Spanish, terminated Mr. Esteños "due to [his] inability to fulfill the requirements of the position."The termination letter explained that, "[t]he job requires fluency in both English and Spanish. [Appellant's] lack of fluency in English makes it impossible for [appellant] to fulfill the requirements of the position."According to appellant, Mr. Supchak told him verbally that he was being terminated because Mr. Supchak "did not understand" appellant's limited English. Mr. Esteños was not replaced; instead his

duties were distributed among other staff members.

Although the record does not indicate the language proficiency of every member of the staff of PAHO/WHO-FCU, several who are identified are listed as being Spanish-English bilingual, and Ms. Decker testified that the credit union's goal was to have everybody on staff be bilingual, presumably to accommodate the credit union's customers, many of whom are Hispanic and may prefer to conduct their personal financial transactions in Spanish. PAHO/WHO-FCU asserts that every employee can speak at least English, and Mr. Supchak and Marites R. Alfaro both speak only English. Ms. Alfaro was the first of eight new employees hired by Mr. Supchak in 2000, over one half of the staff of PAHO/WHO-FCU. Of those hired, at least two are bilingual, the rest unknown; two are identified as Peruvian.[FN1]

> FN1. All the remainder were also born outside the United States: four elsewhere in Latin America, one in Iran and one in the Phillippines. It also appears that Mr. Supchak had hired another Peruvian during his prior tenure as CEO.

Mr. Esteños filed a complaint with the EEOC on September 7, 2000, claiming that his firing was discriminatory, based on national origin, "because of [his] lack of fluency in English."On September 14, 2000, the EEOC gave notice of the claim to PAHO/WHO-FCU and to the D.C. Office of Human Rights ("DC OHR"). PAHO/WHO-FCU confirmed that the reason it fired Mr. Esteños was his lack of English proficiency, adding that "[t]his deficiency ma[kes] it impossible for Mr. Este[ñ]os to communicate with our members and to understand and communicate with some staff members."The following year, after an investigation, the EEOC found "reasonable cause to believe" that PAHO/WHO-FCU violated Title VII, by discriminating on the basis of national origin due to Mr. Esteños's inability to speak English. It also found the employer's proffered reason to be "pretextual" because it had not similarly fired another employee (Ms. Alfaro) who spoke only English and had trouble communicating with some of the credit union's Spanish-speaking customers. PAHO/WHO-FCU disputed the EEOC's determination, citing Mr. Supchak's record of hiring Peruvians, and the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----
--- A.2d ----, 2008 WL 2605060 (D.C.)
(Cite as: --- A.2d ----, 2008 WL 2605060 (D.C.))

necessity that he be able to communicate with the office clerk, without having to resort to other staff as interpreters. Because the EEOC "could not obtain a settlement," on September 14, 2001, it advised appellant of his right to sue, stating again that it found "reasonable cause to believe that violations of [Title VII] occurred with respect to some or all of the matters alleged in the charge." Although the EEOC announced that it did not intend to sue the employer "at this time," it reserved the right to sue the employer at a later time or to intervene in a lawsuit filed by Mr. Esteños. Three months later, on December 14, 2001, appellant filed his complaint in D.C. Superior Court, essentially tracking (and referencing) the findings of the EEOC. [FN2]

> FN2. Appellant's complaint originally alleged violations of both Title VII and the District of Columbia Human Rights Act. PAHO/WHO-FCU removed the lawsuit to the U.S. District Court for the District of Columbia, and promptly moved to have the Federal count dismissed as a matter of law. United States District Judge Colleen Kollar-Kotelly dismissed the Federal claim on the ground that Title VII does not cover organizations, such as PAHO/WHO-FCU, with less than 15 employees. She then remanded the District of Columbia Human Rights Act count to the Superior Court, as a matter of local competence. Neither party appealed Judge Kollar-Kotelly's order. The DCHRA contains no requirement regarding the minimum number of employees.

*3 The trial court denied appellee's motion to dismiss the action as time-barred by the one-year statute of limitations, reasoning "that the EEOC cross-filing [with D.C. OHR] satisfies both the intent and language of" the DCHRA statute of limitations.

After having previously denied appellee's motion for summary judgment as premature, the trial court reheard the motion after discovery was completed, and granted summary judgment on two grounds. First, although the trial court recognized that a person's foreign accent or ability to speak a foreign language could form the basis for a charge of national origin discrimination, it was of the view that the DCHRA does not also protect those who lack the ability to speak English proficiently. [FN3] In any event,

the trial court held, "plaintiff cannot establish the fourth element of a prima facie case, which requires that a similarly situated employee be treated more favorably." Therefore, the trial court granted summary judgment to appellee because appellant was not entitled to relief as a matter of law. In this appeal, Mr. Esteños challenges both prongs of the summary judgment ruling; PAHO/WHO-FCU cross-appeals the trial court's denial of its motion to dismiss under the statute of limitations.

> FN3. The trial court ruled that "plaintiff's alleged national origin sub-class, 'Peruvian immigrants who have not yet become proficient in English' is not supported under the DCHRA."

## II. Statute of Limitations

Unsuccessful motions to dismiss, such as the denial of the motion to dismiss under the statute of limitations raised in appellee's cross-appeal, are reviewed *de novo,* viewing all facts in the light most favorable to the non-moving party. *See Executive Sandwich Shoppe, Inc. v. Carr Realty Corp.,* 749 A.2d 724, 730 (D.C .2000); *Johnson-El v. District of Columbia,* 579 A.2d 163, 166 (D.C.1990).

The relevant time-line for statute of limitation purposes is as follows: Mr. Esteños was fired on August 31, 2000; he filed a complaint with the EEOC on September 7, 2000; EEOC informed PAHO/WHO-FCU and the DC OHR on September 14, 2000; EEOC completed its investigation and sent a Right to Sue letter to Mr. Esteños on September 14, 2001; Mr. Esteños filed suit on December 14, 2001.

The DCHRA provides for filing with the DC OHR as follows:

> *Any* person or *organization, whether or not an aggrieved party, may file with the Office a complaint of a violation* of the provisions of this chapter.... Any complaint under this chapter shall be filed with the Office *within 1 year* of the occurrence of the unlawful discriminatory practice, or the discovery thereof, except as may be modified in accordance with § 2-1403.03 [referring to suits against the DC government].

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----

--- A.2d ----, 2008 WL 2605060 (D.C.)

**(Cite as: --- A.2d ----, 2008 WL 2605060 (D.C.))**

D.C.Code § 2-1403.04(a) (2001) (emphasis added). The DCHRA also provides for filing of private actions in court:

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction for damages and such other remedies as may be appropriate, unless such person has filed a complaint hereunder; provided, that where the Office has dismissed such complaint on the grounds of administrative convenience, or where the complainant has withdrawn a complaint, such person shall maintain all rights to bring suit as if no complaint had been filed. No person who maintains, in a court of competent jurisdiction, any action based upon an act which would be an unlawful discriminatory practice under this chapter may file the same complaint with the Office. A private cause of action pursuant to this chapter shall be filed in a court of competent jurisdiction within *one year* of the unlawful discriminatory act, or the discovery thereof....*The timely filing of a complaint with the Office,* or under the administrative procedures established by the Mayor pursuant to § 2-1403.03, *shall toll the running of the statute of limitations while the complaint is pending.*

**\*4**D.C.Code § 2-1403.16(a) (2001) (emphasis added). The trial court ruled that the EEOC's "cross-filing [with the DC OHR] essentially satisfied the requirements of a complaint [with the DC OHR]." Appellee argues, as it did in the trial court, that plaintiff did not actually file a complaint with the DC OHR, but this is not determinative, for as the trial court correctly ruled, a plaintiff does not need to file *personally* with the OHR to satisfy the statute's tolling requirement. The DC OHR's and EEOC's procedural requirements are to be read broadly and flexibly in the employee's favor in light of their remedial purposes and because they are designed for lay persons. *See, e.g., EEOC v. Commercial Office Prods. Co.,* 486 U.S. 107, 115-16 (1988) (providing benefit of full limitations period to claimant who filed directly with EEOC where federal and state agencies had a work-sharing arrangement); *Love v.. Pullman Co.,* 404 U.S. 522, 525-27 (1972) (Colorado Civil Rights Commission may waive rights in favor of EEOC); *Ivey v. District of Columbia,* No. 05-CV-1029, slip op. at 8 (D.C. June 5, 2008) (applying *Commercial Office Prods. Co.* to work-sharing agreement between EEOC and DC OHR); *Fowler v.*

*District of Columbia,* 122 F.Supp.2d. 37, 42-43 (D.D.C.2000) (DC OHR/EEOC cooperation agreement is designed to avoid double-filing and should be respected). Under such a broad reading of the statute's filing requirement, appellant's timely filing with the EEOC, of which DC OHR promptly received a copy under the existing agreement between the federal and local agencies, sufficed to toll the limitations period for filing in court. Moreover, even under a literal reading of the DCHRA, "*any* person or *organization, whether or not an aggrieved party, may file with the Office,*" D.C.Code § 2-1403.04(a) (emphasis added), and "[t]he timely filing of *a* complaint ... shall toll the running of the statute of limitations." D.C.Code § 2-1403.16(a) (emphasis added). As the EEOC qualifies as "any" organization, its timely cross-referral of appellant's EEOC claim to DC OHR tolled the running of the one-year statute of limitations. We, therefore, conclude that the trial court properly denied appellee's motion to dismiss the complaint as time-barred.[FN4]

> FN4. We are unpersuaded by PAHO/WHO-FCU's reliance on *Griffin v. Acacia Group,* No. 97-2816, 1998 U.S. Dist. LEXIS 10854 at *12-13 (D.D.C.1998), for the proposition that since "DC OHR did not assume jurisdiction in this case ... DC OHR never had plaintiff's case, and there never was any action 'pending *before* ' the DC OHR, which would allow tolling."(emphasis added) (quoting 44 D.C.Reg. 4857)(1997); D.C.Code § 1-2556 (1997 Supp.). Even if we were to consider the U.S. District Court's unpublished opinion, it is based on different statutory language that was not in effect at the time Mr. Esteños filed his claim with the EEOC and complaint in the Superior Court. In 1998, when *Griffin* was decided, D.C. law provided that the statute of limitations for filing in court would be tolled "while the complaint is pending *before the [D.C.] Office.*" D.C.Code § 1-2556 (1980) (emphasis added). That is no longer the case. The Human Rights Amendment Act eliminated the requirement that the claim be pending "before the Office."*See* D.C. Law 14-189, § 2(i) (Oct. 1, 2002); D.C.Code § 2-1403.16(a).

--- A.2d ----
Page 5
--- A.2d ----, 2008 WL 2605060 (D.C.)
**(Cite as: --- A.2d ----, 2008 WL 2605060 (D.C.))**

### III. Claim of National Origin Discrimination

### A. Title VII and DCHRA

We follow cases construing Title VII in interpreting and applying the provisions of the DCHRA "when appropriate," that is, to the extent that the acts use similar words and reflect a similar purpose. _Benefits Commc'n Corp. v. Klieforth,_ 642 A.2d 1299, 1301 (D.C.1994); _see, e.g., Lively v. Flexible Packaging Ass'n,_ 830 A .2d 874, 887 (D.C.2003) (en banc); _cf._4 DCMR § 500.2 (1995) ("In general, the Office and the Commission adopt and incorporate by reference current regulations of the U.S. Equal Employment Opportunity Commission and shall follow general principles of Title VII of the Civil Rights Act of 1964, as amended, wherever applicable in interpreting the D.C. Human Rights Act of 1977 ... unless specific guidelines state the contrary.") Our reliance on federal cases construing Title VII, while generally apt, must be mindful of differences between the federal and D.C. laws, however, which can be significant. _See Wallace v. Skadden, Arps, Slate, Meagher & Flom,_ 715 A.2d 873, 889 (D.C.1988); _Arthur Young & Co. v. Sutherland,_ 631 A.2d 354, 371-72 (D.C.1993) (permitting, given language of DCHRA and legislative history, punitive damages not available under Title VII).

*5 An overriding difference is that in enacting the DCHRA, the Council of the District of Columbia intended to go above and beyond the protections afforded to employees by Title VII. The DCHRA not only enumerates more protected classes than Title VII, _compare_D .C.Code § 2-1402.11, _with_ Civil Rights Act of 1964, Title VII, 42 U.S.C. § 2000e-2 (a) (2003), but also announces, "the intent of the Council of the District of Columbia, in enacting this chapter, [is] to secure an end in the District of Columbia to discrimination for any reason other than that of individual merit, including, but not limited to," the enumerated classes. D.C.Code § 2-1401.01. That does not mean, however, that this court will create new protected classes not identified by the legislature. _See Sorrells v. Garfinckel's,_ 565 A.2d 285, 289 (D.C.1989) (rejecting extension of DCHRA where employee failed to claim a protected-class membership). But it does mean that we must read the words of the DCHRA liberally consistent with the Act's sweeping statement of intent. _See George Washington Univ. v. D.C. Bd. of Zoning Adjustment,_

831 A.2d 921, 939 (D.C.2003) ("The Human Rights Act is a broad remedial statute and it is to be generously construed."). As we explain _infra,_ in this case the claimed basis of discrimination, national origin, appears in both Title VII and the DCHRA, and D.C. regulations expressly adopt federal regulations concerning English-proficiency requirements as possible evidence of national origin discrimination.

We have held that under the "Effects Clause" of the DCHRA, D.C.Code § 2-1402.68,[FN5]"despite the absence of any intention to discriminate, practices are unlawful if they bear disproportionately on a protected class and are not independently justified for some nondiscriminatory reason."_Gay Rights Coalition of Georgetown Univ. Law Ctr. v. Georgetown Univ.,_ 536 A.2d 1, 29 (D.C.1987) (en banc) (citing _Griggs v. Duke Power Co.,_ 401 U.S. 424, 424 (1971) (finding that "none of the Human Rights Act's narrowly-drawn exceptions," such as the ' "business necessity exception' in cases of unintentional discrimination," applied to excuse discrimination based on group's sexual orientation). The DCHRA's "Effects Clause" has no parallel in the language of Title VII, and was modeled on the Supreme Court's opinion in _Griggs v. Duke Power Co._ So in this respect, as well, the statutory language of the DCHRA is broader in scope than that of Title VII (although not as it has been interpreted by the Court to prohibit practices that have a disparate impact).

> FN5."Any practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice."D.C.Code § 2-1402.68.

Yet another difference derives from how federal and District of Columbia law accommodate to the defense of business judgment in evaluating whether a requirement or practice that has an adverse impact on a protected class-which would otherwise be actionable as impermissible discrimination-is nonetheless justified by a "neutral," independent, and non-discriminatory reason. Under Title VII, "it shall not be an unlawful employment practice for an employer to hire and employ, employees ..., on the basis of ... national origin in those certain instances where ... national origin is a bona fide occupational

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----                                                                                                    Page 6
--- A.2d ----, 2008 WL 2605060 (D.C.)
**(Cite as: --- A.2d ----, 2008 WL 2605060 (D.C.))**

qualification reasonably necessary to the normal operation of the particular business or enterprise."42 U.S.C. § 2000c-2 (emphasis added). Applying Title VII [with respect to claims of national origin discrimination], federal courts have held that "an English-only rule ... does not violate Title VII as applied to bilingual employees so long as there is a *legitimate* business purpose."*Prado v. L. Luria & Son Inc.,* 975 F.Supp. 1349, 1354 (S.D.Fla.1997) (emphasis added). The DCHRA, however, does not contain an exception that explicitly permits outright discrimination on the basis of national origin in employment.[FN6]Instead, it statutorily limits justifying *unintentional* discrimination to "business necessity," which is narrowly defined:

> FN6. The DCHRA contains only two exceptions-in addition to "business necessity"-for employment discrimination, for "bona fide" seniority systems or benefit plans, and minimum and maximum age limits for the police officer and firefighter cadet programs. *See*D.C.Code § 2-1402-12.

**\*6** Any practice which has a discriminatory effect and which would otherwise be prohibited by this chapter shall not be deemed unlawful if it can be established that such practice is not intentionally devised or operated to contravene the prohibitions of this chapter and can be justified by business necessity. Under this chapter, a "business necessity" exception is applicable only in each individual case where it can be proved by a respondent that, without such exception, such business cannot be conducted; a "business necessity" exception cannot be justified by the facts of increased cost to business, business efficiency, the comparative characteristics of one group as opposed to another, the stereotyped characterization of one group as opposed to another, and the preferences of co-workers, employers, customers or any other person. D.C.Code § 2-1401.03(a) (2001). This exception, we have said, requires "a good deal more than a mere difficulty in conducting a business by non-discriminatory means."*Natural Motion by Sandra v. D.C. Comm'n on Human Rights,* 687 A.2d 215, 218 (D.C.1997) (citation omitted) (upholding D.C. Commission on Human Rights finding that "occasional absences" due to employee's physical handicap-AIDS-that "caused 'an unspecified

increase in inefficiency in the operation of [a] salon' " is insufficient to meet business necessity exception). The DCHRA places the burden of proving the exception of "business necessity" squarely on the employer, who must meet that burden "in each individual case." D.C.Code § 2-1401.03. Moreover, the business necessity exception should be "interpreted narrowly and with the greatest of caution." COMMITTEE ON EDUCATION AND YOUTH AFFAIRS REPORT ON TITLE 34, THE HUMAN RIGHTS LAW, at 4, Oct. 15, 1973 (tracing the origin of the exception for "business necessity" to *Griggs v. Duke Power Co.* and disavowing subsequent cases "obscur[ing]" the meaning of the exception as well as certain practices permitted by the EEOC guidelines such as, for example, "the preferences of co-workers, employers, customers or any other person(s)"). Thus, we have held that the business necessity exception "could not be invoked to insulate [a company] from the bias or 'preferences of co-workers [and] employees' " where the company's contractor refused to provide plumbing services to a person with AIDS. *Joel Truitt Mgmt., Inc. v. D.C. Comm'n on Human Rights,* 646 A.2d 1007, 1009 (D .C.1994) (per curiam) (quoting D.C.Code § 2-1401.03). As we review Title VII caselaw, therefore, we do so with the understanding that practices that are merely questionable under Title VII may suffice to establish discrimination under the DCHRA. *Compare Prado,* 975 F.Supp. at 1354 (finding legitimate business purpose of English-only rule where manager testified customers preferred not to overhear Spanish), *with*D.C.Code § 2-1401.03 (excluding "preferences of co-workers, employees, customers or any other person" as justification for "business necessity").

### B. The McDonnell Douglas Test

**\*7** "In an employment discrimination case ..., this court has adopted the Supreme Court's approach with respect to the allocation of the burdens of proof under Title VII...."*Atlantic Richfield Co. v. D.C. Comm'n on Human Rights,* 515 A.2d 1095, 1099 (D.C.1986). For cases alleging disparate treatment [FN7] based on an impermissible discriminatory ground, the Supreme Court established a burden-shifting analytical framework in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973): [FN8]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN7. A different conceptual basis for establishing discrimination is the doctrine of disparate impact, embodied in the DCHRA's Effects Clause, discussed *supra,* which analyzes the effect of facially neutral practices on a particular protected group. *See* D.C.Code § 2-1402.68, note 5, *supra; Griggs,* 401 U.S. 424; *Gay Rights Coalition,* 536 A.2d at 29.

FN8. It is understood that the *McDonnell Douglas* test is a means to establish discrimination inferentially by circumstantial evidence. If the employee offers direct rather than circumstantial evidence of discrimination, then the *Price Waterhouse* "mixed motives" test is applied. To make a *prima facie* case of discrimination, a plaintiff need only provide evidence that a decision-maker possesses a prejudice or bias, and then prove to the factfinder that "that attitude was more likely than not a motivating factor in the employer's decision to terminate." *Hollins v. Fed. Nat'l Mortgage Ass'n,* 760 A.2d 563, 574-75 (D.C.2000) (quoting *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258 (1989)). In such a case, the "similarly situated" test of *McDonnell Douglas* is irrelevant.

The complainant in a Title VII trial must carry the initial burden under the statute of establishing a *prima facie* case of ... discrimination. This may be done by showing (i) that he belongs to a [protected class]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

The complainant's burden of establishing a *prima facie* case of discrimination is "not onerous." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981). Once the complainant makes a *prima facie* case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*

*Corp.,* 411 U.S. at 802. Finally, the employee may rebut the employer's non-discriminatory reason as pretextual and endeavor to meet his ultimate burden of showing impermissible discrimination. *See id.* at 804; *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 146-47 (2000). The test, of course, should be modified to the facts at hand, which involve a termination, not a failure to hire, and the proper inquiry is whether "termination was based on the characteristic that placed [claimant] in the protected class," *McManus v. MCI Commc'ns Corp.,* 748 A.2d 949, 954 (D.C.2000). Whenever the employer did not seek to or did not actually replace the claimant with another employee, as here, we have modified the fourth factor of the *prima facie* case to require that the claimant show that a "similarly situated" person outside of his protected class "w[as] not terminated but w[as] instead treated more favorably." *Id.* That person, appellant has claimed in the trial court and on appeal, was Ms. Alfaro, who is from the Phillippines, and was not fired notwithstanding that her inability to speak Spanish caused difficulties in her communications with some of the credit union's customers.

## C. Title VII Regulations and Caselaw

Language-proficiency requirements can be based on perfectly legitimate considerations, but they are also capable of use to discriminate against nationals of countries where the language is not generally spoken. In regulations issued to implement the prohibition against employment discrimination based on national origin, the EEOC "defines national origin discrimination broadly, as including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group." 29 C.F.R. § 1606.1(2008). The EEOC regulations establish that "[t]he title VII principles of disparate treatment and adverse impact equally apply to national origin discrimination." *Id.* at § 1606.2. [FN9] With respect to the "linguistic characteristics" of persons of a national origin group, the EEOC has identified "fluency-in-English" [FN10] and "English-only" [FN11] requirements for employment as possibly discriminatory and, thus, it will "carefully investigate charges involving these selection procedures for both disparate treatment and adverse impact on the basis of national origin." *Id.* at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----

--- A.2d ----, 2008 WL 2605060 (D.C.)

**(Cite as: --- A.2d ----, 2008 WL 2605060 (D.C.))**

Page 8

§ 1606.6(b)(1).[FN12]

FN9. For that reason, for example, height and weight requirements, "which tend to exclude individuals on the basis of national origin" must be evaluated for adverse impact by employers "regardless of whether the total selection process has an adverse impact based on national origin."29 C.F.R. at § 1606.6(a)(2).

FN10. "Fluency-in-English" requirements include denial of employment opportunities because of a person's foreign accent or "inability to communicate well in English."29 C.F.R. § 1606.6(b)(1).

FN11. The EEOC regulations provide, with respect to the related but distinct "speak-English-only" job rules:

§ 1606.7 Speak-English-only rules.

(b) When applied only at certain times. An employer may have a rule requiring that employees speak only in English at certain times where the employer can show that the rule is justified by business necessity.

(c) Notice of the rule. It is common for individuals whose primary language is not English to inadvertently change from speaking English to speaking their primary language. Therefore, if an employer believes it has a business necessity for a speak-English-only rule at certain times, the employer should inform its employees of the general circumstances when speaking only in English is required and of the consequences of violating the rule. If an employer fails to effectively notify its employees of the rule and makes an adverse employment decision against an individual based on a violation of the rule, the Commission will consider the employer's application of the rule as evidence of discrimination on the basis of national origin.

29 C.F.R § 1606.7.

FN12. Although such requirements are subject to scrutiny, they may not ultimately be grounds for discrimination under Title VII if justified under the "bottom line" concept. 29 C.F.R. § 1606.6(b). The "bottom line" concept is defined in terms of "adverse impact," which in turn refers to the "four fifths rule." *Id.* at § 1607.4 C-D. Height and weight requirements, on the other hand, are considered exceptions to the "bottom line" concept. *Id.* at § 1606.6(a)(2). We need not and do not consider in the context of deciding whether summary judgment was appropriate in this case, how (or whether) the "bottom line concept" in the EEOC regulations meshes with the "business necessity" exception of the DCHRA, which is to be proven by the employer in "each individual case." D.C.Code § 2-1401.03(a).

**\*8** Federal courts recognize the potential discriminatory impact of certain linguistic requirements and, consequently, have found that Title VII offers employees protection against that kind of discrimination, understanding, for example, that "[a]ccent and national origin are obviously inextricably intertwined in many cases ."*Fragante v. City & County of Honolulu,* 888 F.2d 591, 596 (9th Cir.1989).[FN13] Consistent with the EEOC's policy to "carefully investigate" fluency-in-English and English-only requirements, one federal appellate court has "encourage[d] a very searching look" in such cases because otherwise

FN13. We perceive some overlap between cases in which employees are fired because of their accent and those where there is a requirement of English fluency. In some sense, the significance between the two could be viewed as one of degree. As appellant points out, the basis for an English proficiency requirement is very different when applied to a law clerk and to a janitor who cleans the courthouse. In any event, the exact reason why Mr. Esteños was fired is unclear. Mr. Supchak's letter mentioned his lack of proficiency in English, but Mr. Esteños testified that Mr. Supchak told him

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----
--- A.2d ----, 2008 WL 2605060 (D.C.)
**(Cite as: --- A.2d ----, 2008 WL 2605060 (D.C.))**

he could not understand his English, possibly a reference to Esteños's heavy Spanish accent.

[i]t would therefore be an easy refuge in this context for an employer unlawfully discriminating against someone based on national origin to state falsely that it was not the person's national origin that caused the employment or promotion problem, but the candidate's inability to measure up to the communications skills demanded by the job. *Id.* Not surprisingly, the decided cases reveal that the determination of whether an employment action based on an employee's linguistic characteristic is discriminatory is highly fact-bound and, for that reason, unlikely to be resolved on summary judgment. For example, what on its face may appear a legitimate business requirement, if improperly applied, could constitute unlawful national origin discrimination. In *Carino v. City of Oklahoma*, 750 F.2d 815, 819 (10th Cir.1984), the court held that the plaintiff's Filipino accent was not a valid reason to terminate employment as a dental laboratory supervisor. In *Fragante*, 888 F.2d at 596-98, on the other hand, the court held that Mr. Fragante's "pronounced Filipino accent ... interfered materially with job performance," which required the ability to communicate orally only when interacting with the public at the Honolulu Division of Motor Vehicles and Licensing.[FN14]

> FN14. Although in *Fragante* the court followed the EEOC's guidance and "carefully investigate[d]" employment requirements based on language, interestingly it disavowed deference to the EEOC's language rules, *see*29 C.F.R. § 1606, as *not* constituting the EEOC's authoritative interpretation of the law, but due only "careful consideration." 888 F.2d at 597.

### D. District of Columbia Law & Regulations

The OHR and the District of Columbia Human Rights Commission have specifically adopted the above-quoted EEOC regulations dealing with national origin discrimination. *See*4 DCMR § 511.1 ("The Office and Commission adopt and incorporate by reference the guidelines on National Origin Discrimination promulgated by the [EEOC], which

appear in 29 C.F.R. § 1606"); *see also*4 DCMR § 500.2 ("In general, the Office and the Commission adopt and incorporate by reference current regulations of the [EEOC] and shall follow general principles of Title VII ... wherever applicable ... unless specific guidelines state the contrary"). Since the EEOC regulations have been incorporated into the District's regulatory law by the agencies charged with implementing the DCHRA, we owe them deference in interpreting the DCHRA. *See U.S. Parole Comm'n v. Noble*, 693 A.2d 1084, 1096-97 (1997) (en banc)."[W]e defer to agency construction of statutes because of the agency's presumed expertise in construing the statute it administers.... We therefore have deferred ... for example ... to the Office of Human Rights when presented with different possible interpretations of the Human Rights Act...."*Id.*(citing *Timus v. D.C. Dep't of Human Rights*, 633 A.2d 751, 758-60 (D.C.1993) (en banc)).[FN15] We see no reason to reject the agency's broad interpretation as the inference of national origin discrimination flowing from linguistic characteristics recognized in the EEOC regulations adopted by the DC OHR is reasonable and finds statutory footing in the "Effects Clause" of the DCHRA. *See*D .C.Code § 2-1402.68, note 5, *supra*.

> FN15. The same deference is not necessarily owed to the EEOC's Compliance Manual. *See AMTRAK v. Morgan*, 536 U.S. 101, 111 n. 6 (U.S.2002) ("[T]he EEOC's interpretive guidelines do not receive *Chevron* deference," and are only useful in Title VII cases, "to the extent that those interpretations have the 'power to persuade.' " (citations omitted)); *see also Christensen v. Harris County*, 529 U.S. 576, 587 (2000); *Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 449 (2003) (all citing the lower-deference standard from *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

### E. Summary Judgment

**\*9** This court reviews the grant of a motion for summary judgment *de novo, see Velasquez v. Essex Condo. Ass'n*, 759 A.2d 676, 679 (D.C.2000), under the same standard as the trial court: whether there are any material issues of fact in dispute and the moving party is entitled to judgment as a matter of law. *See Joeckel v. Disabled Am. Veterans*, 793 A.2d 1279,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1281 (D.C.2002). In considering a motion for summary judgment, all evidence and inferences from that evidence must be viewed in the light most favorable to the non-moving party. *See id.*The opposition, however, must consist of more than conclusory allegations, and be supported by affidavits or other competent evidence tending to prove disputed material issues of fact. *See Beard v. Goodyear Tire & Rubber Co., 587 A.2d 195, 198-99 (D.C.1991).* In a discrimination case, summary judgment is appropriate where the plaintiff fails to present a *prima facie* case or, even assuming a *prima facie* case, where there is no genuine issue of material fact "that the employer's non-discriminatory reason is pretextual."*Mitchell v. DCX, Inc., 274 F.Supp.2d 33, 39 (D.D.C.2003).*

We disagree with the trial court's legal determination that appellant's claim based on lack of English proficiency has "no support" in the DCHRA. In light of the EEOC regulations recognizing a link between linguistic characteristics (such as the inability to speak English fluently) and national origin that have been incorporated into D.C. law, Mr. Esteños has initially presented a cognizable claim of national origin discrimination under the DCHRA, and satisfied the first prong of a *prima facie* case because appellee's English-proficiency requirement may be evidence of discrimination on the basis of his Peruvian national origin.[FN16]We also reject the trial court's determination that Mr. Esteños failed to meet the fourth prong of a *prima facie* case because he offered "no evidence that Ms. Alfaro's position demands the *same* duties and tasks as plaintiff's position as 'Office Clerk.' " (Emphasis added). But the fourth prong's comparison with another employee who is "similarly situated" cannot mean "identical" in a situation where the employee has not been replaced, as contemplated by *McManus. See 748 A.2d at 955 n. 5* ("[A]ppellant ... [is] required to show that the jobs of one or more persons who were not members of the protected class, and who had jobs *similar* to hers had not been terminated." (emphasis added)). The point is that Mr. Esteños's proffered evidence that Ms. Alfaro was one of the persons who assumed some of his responsibilities and that, in any event, when she had difficulty communicating with the credit union's customers in Spanish-whatever the formal requirements of her job description-she was not fired as he was. This was enough on the particular facts presented here to defeat summary judgment on the ground that he had failed the "not onerous"

burden of making out a *prima facie* case. Therefore, the trial court erred as a matter of law in dismissing the complaint on the ground that Mr. Esteños had not presented a *prima facie* case of discrimination under the DCHRA.

> FN16. Thus, an issue is raised of possible discrimination on the basis of Mr. Esteños's status as a Peruvian, regardless of the existence *vel non* of a distinct protected "subclass" of non-English-speaking Peruvians, an issue relied on by the trial court but which we need not address on this appeal. See note 3, *supra.*

*10 Presentation of a *prima facie* case raises a presumption of discrimination, which shifts the burden of production to the employer to justify its action as the product of an independent non-discriminatory reason. *See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993).* On the record before us, it is undisputed that Mr. Esteños was fired on the stated ground that he did not meet PAHO/WHO-FCU's fluency-in-English requirement,[FN17] which the employer asserts is a non-discriminatory reason because English proficiency was "required" for the office clerk position.[FN18]What clearly remains in dispute, with conflicting evidence on both sides, as demonstrated by Mr. Esteños's opposition to the summary judgment motion, is, first, whether English proficiency was in fact a necessary requirement for this particular office clerk position, asserted by the employer as the reason for the termination, and, second, the level of Mr. Esteños's actual proficiency in English at that time. Appellee has asserted that "appellant's lack of fluency in English made it impossible for appellant to fulfill the requirements of the position," and that the English-proficiency requirement was applied in a non-discriminatory manner in light of appellant's actual command of English. But appellant has disputed both points, and these material facts that may bear on the issue of pretext are open to resolution by the fact finder. Although there may be certain situations where an employer's need to communicate with a subordinate employee may require that the latter literally be able to speak the supervisor's language, *see Garcia v. Gloor, 618 F.2d 264, 271 (5th Cir.1980)* (upholding English-only requirement so as to "provid[e] English speaking supervisors the ability to manage the enterprise by knowing what was said

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----
--- A.2d ----, 2008 WL 2605060 (D.C.)
**(Cite as: --- A.2d ----, 2008 WL 2605060 (D.C.))**

in the work area"), there is evidence disputing that such was the case here, given the favorable evaluation of Mr. Esteños's performance of his duties as office clerk and Ms. Decker's testimony that the CEO had no need to communicate verbally with the office clerk. Moreover, there is a dispute as to the extent to which Mr. Esteños's English (though concededly somewhat limited) was sufficient for his position, in light of Ms. Decker's testimony that she was, in fact, able to speak with Mr. Esteños in English during staff meetings. These disputed issues of material fact preclude the grant of summary judgment on the basis that the employer has proven a valid, non-discriminatory reason for terminating his employment. For example, in _Kyriazi v. Western Elec. Co.,_ 461 F.Supp. 894 (D.N.J.1978), a sex discrimination case, the court dismissed as pretext the employer's allegations that Ms. Kyriazi was a "slow learner" with an "inability to communicate in English," pointing out that any immigrant who earns a graduate degree from Columbia University should be bright and articulate enough to communicate in a job that does not require a college degree. _See id._ at 925.Here, appellant, a trained accountant, was performing clerical duties, and the EEOC's Washington field office determined that appellee's proffered non-discriminatory reason was pretextual, making it inappropriate to decide that issue as a matter of law, rather than subject its credibility to assessment at trial by the finder of fact.

> FN17. It could be argued that PAHO/WHO-FCU also enforced a speak-English-only rule that was "applied only at certain times," see note 11, _supra,_ namely, when Mr. Supchak wanted to speak with the employee, but this basis was not asserted by appellant before the trial court.

> FN18. According to the job description proffered by employer, a requirement of the office clerk position is "[v]ery good knowledge of English and Spanish."The termination letter sent to Mr. Esteños stated that "the job requires fluency in both English and Spanish."We address here the English proficiency issue solely in the precise context presented by the employer (_i.e.,_ as indispensable to carry on the duties of the position).

*11 Moreover, appellant has argued that, even assuming that the English-proficiency requirement predated his hiring (or, alternatively, that the job's requirements changed once Mr. Supchak became CEO), he did not receive proper notice of the rule, having been told when he was hired only that he "should continue studying English" in order to progress to a more advanced position, but, "not ... that speaking English was a requirement for the office clerk job."In such a case, as there was no question that he otherwise satisfactorily performed as a clerk, appellant argues that appellee discriminated against him by not providing a transition period to permit him to improve his English proficiency or seek some interim alternative to facilitate his communications with Mr. Supchak.[FN19]In light of the material facts in dispute, summary judgment was improper. Although it is not necessary to our determination that Mr. Esteños has presented enough evidence of pretextuality to survive summary judgment, our conclusion is buttressed by the EEOC's determination, stated in the Right to Sue Letter, that it "found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charges."

> FN19. As noted, most of the credit union's employees are bilingual and probably could have provided any necessary interpretation, as they previously had done, if and when (itself a disputed issue of fact) the office clerk needed to communicate with the CEO.

We stress, however, that surviving summary judgment is far from establishing liability for discrimination under the DCHRA. Once appellant made a _prima facie_ case and the employer presented a non-discriminatory reason, "the _McDonnell Douglas_ framework-with its presumptions and burdens-disappeared, and the sole remaining issue was discrimination _vel non."_ _Reeves,_ 530 U.S. at 142-43 (quotation marks and citations omitted). Because the trial court ruled that the DCHRA did not support a claim of national origin discrimination based on linguistic characteristics, the parties did not develop a factual basis from which the jury could determine whether the English proficiency requirement was, as claimed by appellee, required to perform the duties of the position appellant held, as in _Fragante, see also Dalmau v. Vicao Aerea Rio-Grandense,_ S.A., 337 F.Supp.2d 1299 (S.D.Fla.2004) (upholding Brazilian

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

airline's requirement that cargo sales representatives speak fluent Portuguese), or whether it was a pretextual requirement. The trial court did not focus to any significant degree on the import of appellee's actual national origin hiring practice. Since Mr. Supchak among other actions hired two Peruvians in the same year that he fired Mr. Esteños, PAHO/WHO-FCU argues that it has strong evidence that Mr. Supchak harbors no prejudice against Peruvians.

In deciding that this case must be remanded, we rely particularly on the Supreme Court's decision in *Reeves,* 530 U.S. at 142, reversing a grant of judgment as a matter of law setting aside a jury verdict for the employee in an age discrimination case alleging disparate treatment. Applying the "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt,' " the Court held that a claimant's presentation of a "*prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."*Id.* at 147-48 (citation omitted)."The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination."*Id.* at 153;*see id.* at 147 (explaining that "it is not enough ... to *disbelieve* the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination").[FN20] The Court emphasized the intense factual nature of the ultimate issue, so that:

> FN20. As already discussed, the DCHRA also offers protection against *un* intentional discrimination under the Effects Clause, in which case the employer may defend based only on the narrowly-drawn exceptions in the DCHRA, *see Gay Rights Coalition of Georgetown Univ. Law Ctr.,* 536 A.2d at 29. Under a disparate *impact* theory, the employer's good faith "does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability."*Smith v. City of Jackson,* 544 U.S. 228, 234 (2005) (quoting *Griggs,* 401 U.S. at 432). Although cases challenging language requirements

have often been analyzed under a disparate impact theory, Mr. Esteños's claim was presented to the trial court as a case of disparate *treatment,* not disparate impact, and analyzed under the *McDonnell Douglas* framework. In determining the ultimate question of intentional discrimination in a disparate treatment case, a fact finder's conclusion that the position did not in fact require English proficiency beyond that of Mr. Esteños's does not necessarily preclude a jury determination that appellee's contrary view was one held in good faith. *See Fischbach v. D.C. Dep't of Corr.,* 318 U.S.App. D.C. 186, 189, 86 F.3d 1180, 1183 (D.C.Cir.1996) ("Once the employer has articulated a non-discriminatory explanation for its action, ... the issue is not 'the correctness or desirability of [the] reasons offered ... [but] whether the employer honestly believes in the reasons it offers.' " (alterations in original)).

**\*12** [w]hether judgment as a matter of law is appropriate in any particular case will depend on a number of factors [ ] .... includ[ing] the strength of the plaintiff's *prima facie* case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

*Id.* at 148-49.Based on the evidence that had been presented at trial, the Court held that the lower court had "impermissibly substituted its judgment concerning the weight of the evidence for the jury's."*Id.* at 153.[FN21]

> FN21. The Court considered that judgment as a matter of law would be appropriate if evidence of record "conclusively revealed some other, non-discriminatory reason for the employer's decision," or if the evidence of pretextuality was "weak ... and there was abundant and uncontroverted independent evidence that no discrimination had occurred."*Reeves,* 530 U.S. at 148. Neither situation obtains here. In this case, the evidence of pretextuality may be controverted, but it was not "weak," as the employer's records showed that Mr. Esteños

--- A.2d ----                                                                                       Page 13
--- A.2d ----, 2008 WL 2605060 (D.C.)
**(Cite as: --- A.2d ----, 2008 WL 2605060 (D.C.))**

had been performing his work in a satisfactory manner before Mr. Supchak's arrival.

Here, we are reviewing a grant of summary judgment before trial and, unlike in *Reeves,* the parties have not had an opportunity to fully present their evidence and submit its credibility to the trier of fact. Assuming (as our colleague does) that the existence of other employees of appellant's same national origin in appellee's workforce could, as a matter of law, defeat a *prima facie* case of national origin discrimination where evidence of pretextuality has been presented, *but see*29 C.F.R. § 1606.1 (defining national origin discrimination as the denial of equal opportunity "because of an individual's ... place of origin; *or* because an individual has the ... linguistic characteristics of a national origin group" (emphasis added)), on the authority of *Reeves* we are unwilling on this limited record and at this early point in the proceedings to rest an affirmance solely on this alternate ground. *See Reeves,* 530 U.S. at 153 (noting that the fact that employer had hired "many managers over age of 50-although relevant, is *certainly not dispositive* " (citing *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 580 (1978) (emphasis added))); *id.* at 155 (noting that "the ultimate question of liability ordinarily should not be taken from the jury once the plaintiff has introduced" a *prima facie* case and evidence of pretextuality) (Ginsburg, J., concurring); *see also Dantley v. Howard Univ.,* 801 A.2d 962 (D.C.2002) (reversing summary judgment and remanding to trial court for further consideration relating to material fact in dispute)); *Cormier v. D.C. Water and Sewer Auth.,* 946 A.2d 340, 343 (D.C.2008) (same with respect to amount of damages).

The grant of summary judgment to appellee is reversed and the case remanded for further proceedings consistent with this opinion.

*So ordered.*
SCHWELB, Senior Judge, concurring in part [FN1] and dissenting in part:

> FN1. I agree, substantially for the reasons stated in Part II of the court's opinion, that Esteños' action is not time-barred.

The principal issue in this case, as framed by the court, maj. op. at 2, is whether, under the DCHRA, a claim of employment discrimination based on national origin may properly be founded upon the employer's imposition of a requirement that its employees be proficient in English.[FN2]I do not doubt that there are situations in which this question should be answered in the affirmative; inability to speak English may be a proxy for national origin discrimination where, *e.g.,* it is used to exclude Latinos and to keep a work force all-Anglo or predominantly Anglo. *See*29 C.F.R. § 1606(b). In my opinion, however, no impartial trier of fact could reasonably find, on this record, and in light of the overwhelmingly Latino and non-Anglo composition of the credit union's work force and of its numerous Latino customers, that plaintiff Juan R. Esteños was discharged because of his Peruvian (or Latino) national origin. Accordingly, I would affirm the award of summary judgment in the employer's favor.

> FN2. My separate opinion addresses only this issue. The majority does not base its decision on a "disparate impact" analysis, see maj. op. at 17 n. 7 and accompanying text, and I would vote to affirm under that test as well.

**I.**

**\*13** The DCHRA makes it unlawful, *inter alia,* to discharge a person "wholly or partially for a discriminatory reason based upon "the race, color, religion, [or] *national origin....* of any individual."D.C.Code § 2-1402.11 (2001). (Emphasis added.) "National origin" means "the state, country or nation in which a person or his or her ancestors were born."4 DCMR § 599. The stated reason for Esteños' discharge was not his Peruvian or Latin-American national origin, but rather his lack of English fluency. It is undisputed that a Peruvian or other Latino who shares Esteños' national origin, but who is sufficiently fluent in English, is acceptable to the credit union. In fact, ten days before Esteños was fired, the credit union hired an Operations Manager who, like Esteños, was born in Peru. Conversely, the record provides no reason to doubt that a Caucasian individual of purely European national origin-French, Swedish, German, or Czech-would be ineligible for employment with the defendant (just as Esteños is) if he or she were not fluent in English. Inability to speak English adequately is thus decisive, regardless of the national origin of the complainant. According

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the language of the statute its plain and literal meaning, it is difficult to comprehend how Esteños' discharge could have violated the Act.

It appears from the record that when Esteños lost his job, the credit union was a very small office, with only nine employees. Esteños was discharged in August, 2000, and eight employees were hired between August 2 and November 14 of that year. The countries of birth of these eight employees were as follows:

Peru 2

Venezuela 1

Bolivia 1

Ecuador 1

El Salvador 1

Philippines 1

Iran 1

Thus, six of the eight employees were from Latin America, and none was European or Anglo. As previously noted, a Peruvian-American was hired as "operations manager" ten days before Esteños was discharged. Further, it appears to be undisputed that many of the credit union's customers are Latino and speak Spanish. Given this scenario, the "man on the Clapham bus"-the personification, in days gone by, of the reasonable person-would find startling indeed the suggestion that Esteños was fired because he comes from Peru. Facts are stubborn things, and the ethnic composition of the work force, as well as the surrounding circumstances, are far removed from the facts in most conventional cases of discrimination based on national origin.

Perhaps the illogic of the plaintiff's position can best be illustrated by following his theory to its logical conclusion. Suppose that *all* of the credit union's employees were of Peruvian national origin and that all of them spoke excellent English. Suppose, further, that the person who fired Esteños was also from Peru. At least at the summary judgment stage, under the plaintiff's theory, apparently agreed to by the court,

the predominance of Latino employees and the virtual absence of Anglos makes no difference. Therefore, Esteños could successfully claim, even in the all-Peruvian situation that I have hypothesized, that based on the perceived close connection between language proficiency and national origin, the reason for his discharge was his national origin. He could avoid summary judgment, under the majority's analysis, even though all of the other employees, as well as the person responsible for the challenged decision, were Peruvian-American. Surely, the law does not countenance such a counter-intuitive and (in my view) absurd result.

## II.

**\*14** Although the majority appears to accord little, if any, weight to the tale told by the statistics described above, the case law pays them greater heed. " 'In the problem of racial discrimination,[FN3] statistics often tell much, and Courts listen.' " *Harris v. District of Columbia Comm'n on Human Rights,* 562 A.2d 625, 632 (D.C.1989) (quoting *State of Alabama v. United States,* 304 F.2d 583, 586 (5th Cir.), aff'd,371 U.S. 37 (1962)); [FN4]*Burns v. Thiokol Chemical Corp.,* 483 F.2d 300, 305 (5th Cir.1973). Further, in *Harris,* we applied the statistically-oriented analysis utilized by the federal appellate courts:

> FN3. And, by analogy, discrimination based on national origin.

> FN4. In *State of Alabama,* the court added that "[h]ere, [the statistics] are spectacular."304 F.2d at 586. The same may fairly be said here.

Our wide experience with cases involving racial discrimination in education, employment, and other segments of society have led us to rely heavily in Title VII cases on the empirical data which show an employer's overall pattern of conduct in determining whether he has discriminated against particular individuals or a class as a whole. *Id.* (quoting *Burns,* 483 F.2d at 305). So, too, in *Arrocha v. City Univ. of New York,* 2004 WL 594981 (E.D.N.Y.2004), in granting partial summary judgment in favor of the defendant against a Panamanian instructor's claim of discrimination based on national origin, the court held that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the record fails to reasonably support a finding of prohibited national origin discrimination. Although there is no evidence regarding the number of Panamanians employed by MEC, five of the eight adjunct instructors reappointed are natives of South or Central American countries, including Argentina, Peru, Mexico, and the Dominican Republic. Diversity in an employer's staff undercuts an inference of discriminatory intent.

(Citations omitted.) [FN5] The court's reasoning in *Arrocha* applies *a fortiori* to the even more compelling statistics in this case.

> FN5. The court denied the University's motion for summary judgment with respect to the plaintiff's claims of discrimination based on color and on retaliation.

## III.

In reversing the award of summary judgment, the majority relies heavily on the Supreme Court's decision in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), a case involving a claim of age discrimination in employment. My colleagues cite *Reeves* for two separate propositions: (1) that discriminatory intent may often be properly inferred if the trier of fact finds the employer's explanation of the challenged action to be incredible; and (2) that the presence in the employer's work force of managers in the same age range as the plaintiff does not warrant the direction of a verdict in the employer's favor. The differences between *Reeves* and the present case, however, are striking. The Supreme Court's analysis in *Reeves* must be considered in the context of the compelling evidence of discriminatory animus which was present in that case, but which was completely absent from the present record.

In *Reeves,* the plaintiff, who was fifty-seven years old, and who had worked for the employer for forty years, was discharged from his position. He brought suit against the employer, alleging, *inter alia,* that his supervisor, who was the husband of the company's owner, told him that he was "so old [he] must have come over on the Mayflower" and that he was "too damn old to do [his] job." 530 U.S. at 151. There was disputed testimony regarding whether Reeves had performed his job satisfactorily and whether his discharge was warranted.

*15 The jury returned a verdict in Reeves' favor, but the United States Court of Appeals for the Fifth Circuit reversed, holding that although the jury could properly have found that the employer's explanation for its discharge of Reeves was pretextual, such proof was insufficient, even in conjunction with the evidence of age-based animus, to support a verdict in Reeves' favor. *Reeves v. Sanderson Plumbing Products, Inc.,* 197 F.3d 688 (5th Cir.1999). The Supreme Court, however, reversed the decision of the Court of Appeals and reinstated the verdict and judgment. In the course of its opinion, the Court recognized that "[p]roving the employer's [stated] reason [for discharging an employee] false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination." 530 U.S. at 147. "[O]nce the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id.* (citation omitted).

Significantly for the purposes of the present case, however, the Court made it clear that such a showing will not always be sufficient. On the contrary, it will be inadequate "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue *and there was abundant and uncontroverted independent evidence that no discrimination had occurred. Id.* at 148 (emphasis added). Further, if "the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent."*Id.* (internal citation and quotation marks omitted). The Court also stated that the fact the company employed many managers over the age of fifty, while relevant, "was not sufficient to *conclusively* demonstrate that [the employer's] actions were not discriminatorily motivated."*Id.* at 153 (emphasis in original) (citing *Furnco Constr. Corp v. Waters,* 438 U.S. 567, 580 (1978)).

## IV.

In my opinion, the Supreme Court's decision in *Reeves* does not support reversal here. First, the case cannot readily be wrenched from its context, and, in particular, from the remarks of Reeves' boss that

--- A.2d ----
--- A.2d ----, 2008 WL 2605060 (D.C.)
(Cite as: --- A.2d ----, 2008 WL 2605060 (D.C.))

Page 16

Reeves must have come over on the Mayflower and was "too damn old." With such evidence in the record, it is difficult to understand how the United States Court of Appeals, which was obliged to view the record in the light most favorable to the plaintiff, could hold that the plaintiff's case was insufficient as a matter of law. Unsurprisingly, the Supreme Court's decision reinstating the verdict was unanimous.

This case differs from *Reeves,* aside from the absence of proof of discriminatory animus, because there was only limited evidence in the present record that the employer's stated grounds for dismissal were false. *Cf. Reeves,* 530 U.S. at 148. Esteños claims that his English was, in fact, good enough, especially given the nature of his job, and that a genuine issue of material fact is presented in that regard. Leonard Supchak, the credit union's CEO, who does not speak Spanish, apparently told Esteños that he (Supchak) did not understand Esteños' limited English and could not communicate with him effectively. Even if we were to assume, *arguendo,* that Supchak's stated reason for Esteños' termination was pretextual, and that Supchak was concealing his true motive, there is simply no basis, on this record, for inferring that Supchak's real motive for firing Esteños, however unwarranted that motive might be, was that Esteños is from Peru. In other words, even if Esteños' English was better than Supchak claimed it to be, and even if it was sufficient to permit Esteños to do his job, one cannot reasonably infer from this alleged fact that Supchak fired Esteños because Esteños is of Peruvian national origin. Aside from the overwhelmingly Latino composition of the work force, a Peruvian-American was hired as a manager just ten days before Esteños' was discharged. In my opinion, even if Supchak is disbelieved, the notion that Esteños' Peruvian or Latino national origin played a role in the credit union's action is entirely without foundation.

**\*16** I recognize that the presence of other Latinos, including that of a Peruvian-American manager, does not automatically require a finding that Esteños was not a victim of discrimination based on national origin. In *Reeves,* the Court reiterated this point, 530 U.S. at 153, and I would not dispute it even if I were free to do so. But the statistical evidence in this case differs from that in *Reeves* in that almost all of the credit union's employees were of the same national origin as that which supposedly constituted the reason for Esteños' discharge.[FN6] Of the eight

employees hired at or near the time that Esteños was fired, six (75%) were Latino, two (25%) were Asian, and not a single one was Anglo.[FN7] If Supchak was concealing some unknown malign motivation when he discharged Esteños for lack of proficiency in English, the remarkable statistics *in this case* demonstrate that Supchak's motivation surely was not based on Esteños' national origin.

> FN6. In *Khiem v. United States,* 612 A.2d 160, 164 (D.C.1992), we explained:
>
> > In *Kraft v. Kraft,* 155 A.2d 910 (D.C.1959), the court pointed out that:
> >
> > > It is well to remember that significance is given to broad and general statements of the law only by comparing the facts from which they arise with those facts to which they supposedly apply.
> >
> > 155 A.2d at 913. *See also Armour & Co. v. Wantock,* 323 U.S. 126, 132-33 (1944), where the Supreme Court stated:
> >
> > > It is timely again to remind counsel that words of our opinions are to be read in the light of the facts of the order under discussion. *To keep opinions within reasonable bounds precludes writing into them every limitation or variation which might be suggested by the circumstances of cases not before the Court.* General expressions transposed to other facts are often misleading.
> >
> > (Emphasis added in *Khiem.*)
>
> There is nothing in *Reeves* to suggest that all or almost all of the employer's managers were roughly of the plaintiff's age, or that there were few or no younger managers. Without the persuasive evidence of age-based animus directed at the plaintiff in *Reeves,* the Court might well have viewed the inclusion of managers in their fifties in the employer's work force as persuasive evidence that the plaintiff was not discharged because of his age. Moreover, in the absence of the

--- A.2d ----
--- A.2d ----, 2008 WL 2605060 (D.C.)
**(Cite as: --- A.2d ----, 2008 WL 2605060 (D.C.))**

animus evidence, the jury might have reached a different verdict.

FN7. Ordinarily, discrimination against one class or group is intended to favor a different class or group. In this case, the favored group has not been identified by the plaintiff or by the majority, but there is surely no evidence in this case of a preference for Anglos.

## V.

Ultimately, the question on summary judgment is whether, viewing the record in the light most favorable to Esteños, an impartial trier of fact could rationally find that Esteños was fired because he is of Peruvian (or Latino) national origin. *Beard v. Goodyear Tire & Rubber Co.,* 587 A.2d 195, 199 (D.C.1991) ("the test for deciding a motion for summary judgment is essentially the same as that for a motion for a directed verdict") (citing, *inter alia, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252-53 (1986)). I am at a loss to understand how an impartial juror could reasonably so find. Accordingly, I respectfully dissent from the reversal of the judgment in the credit union's favor.

D.C.,2008.
Estenos v. PAHO/WHO Federal Credit Union
--- A.2d ----, 2008 WL 2605060 (D.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                    )
YVES AIGRET,                        )
                                    )
          Plaintiff,                )
                                    )
     v.                             )     Civil Action No. 01-1650 (RWR)
                                    )
COMPASS GROUP NORTH                 )
     AMERICA, INC., et al.,         )
                                    )
          Defendants.               )
_____    )

**MEMORANDUM OPINION AND ORDER**

Plaintiff Yves Aigret filed an action against defendants
Compass Group North America, Inc., Eurest Food Service and
Compass Group USA, Inc., claiming that defendants violated the
federal Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601,
et seq. (1998), and discriminated against him on the basis of his
age in violation of the District of Columbia Human Rights Act
("DCHRA"), D.C. Code Ann. § 1-2512 (1981).[1]  Defendants have
moved to dismiss or, in the alternative, for summary judgment on
plaintiff's DCHRA age discrimination claim, arguing that the
DCHRA claim is barred by the statute's one year limitations
period.  In opposition, plaintiff argues that his DCHRA claim was
timely filed in this court because his charge of discrimination,
which was cross-filed with the District of Columbia Office of

_____

[1]    Section 1-2512 was recodified, without material change, at
D.C. Code Ann. § 2-1402.11 (2001).

- 2 -

Human Rights ("DCOHR") when he filed his charge of discrimination
with the Equal Employment Opportunity Commission ("EEOC"),
remained pending before the DCOHR when he filed this lawsuit,
thus tolling the DCHRA's one year statute of limitations.
Because plaintiff's charge of discrimination with the DCOHR
remained pending at the time he filed his complaint in this
court, and plaintiff has not established that he withdrew his
charge of discrimination from the DCOHR before filing suit, his
DCHRA age discrimination claim will be dismissed without
prejudice because the court lacks subject matter jurisdiction
over DCHRA claims that remain pending with the DCOHR.

<u>BACKGROUND</u>

Plaintiff Yves Aigret filed a charge of discrimination with
the EEOC on November 9, 1999, alleging a violation of the Age
Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C.
§ 621, <u>et</u> <u>seq.</u> (1994).  Plaintiff cross-filed his charge of
discrimination with the DCOHR.  (<u>See</u> Pl.'s Mem. P. & A. in Opp'n
Mot. to Dismiss or, in Alt. Summ. J. ("Pl.'s Opp'n") at Ex. 1
(Declaration of Yves Aigret ("Aigret Decl.")) at Att. 1 (EEOC
Form 5); Defs.' Mem. in Supp. Mot. to Dismiss or, in Alt. Summ.
J. ("Defs.' Mot.") at 2.)  The DCOHR notified the EEOC on
December 20, 1999 that, "[p]ursuant to the worksharing agreement,
[plaintiff's] charge [was] to be initially investigated by the

- 3 -

EEOC." (Aigret Decl. at Att. 5 (EEOC Form 212).) In its notification to the EEOC, the DCOHR checked the box on EEOC Form 212 which acknowledged receipt of plaintiff's charge and also indicated to the EEOC that the DCOHR did not intend "to initially investigate the charge." (Id.) The DCOHR did not check the box on EEOC Form 212 to indicate that the agency was dismissing, closing or not docketing plaintiff's age discrimination charge. (See id.)

On March 5, 2001, the EEOC issued plaintiff a "Dismissal and Notice of Rights," informing plaintiff that the EEOC was closing its file on his charge of discrimination filed with the EEOC.[2] (See id. at Att.4 (EEOC Form 161).) Plaintiff filed this lawsuit on July 30, 2001, claiming that defendants violated the FMLA[3] when they eliminated his position while he was out on short term medical leave from May 7 to August 2, 1999, and discriminated

---

[2]    The March 5, 2001 notice was the second dismissal and notice of rights received by plaintiff. The EEOC originally issued to plaintiff a dismissal and notice of rights dated March 2, 2000, but sometime thereafter revoked and vacated that dismissal. (See Aigret Decl. at Att. 2 (EEOC Form 161) and Att. 3 (Fernandez Ltr.); Pl.'s Opp'n at 2 n.1.)

[3]    Plaintiff's original complaint also asserted a claim under the District of Columbia Family and Medical Leave Act ("DCFMLA"), D.C. Code Ann. § 36-1301, et seq. (1981), which defendants also moved to dismiss asserting that the DCFMLA's one year statute of limitations barred such a claim. (See Defs.' Mot. at 5.) Conceding that argument (see Pl.'s Opp'n at 8), plaintiff amended his complaint to eliminate the DCFMLA claim.

- 4 -

against him on the basis of his age in violation of the DCHRA
when they offered him in August 1999 the choice of a job
termination or a demotion.

DISCUSSION

Before a court may address the merits of a complaint, it
must be assured that it has the authority to exercise
jurisdiction over the claims. See Scott v. England, 264 F. Supp.
2d 5, 8 (D.D.C. 2002) (citing Steel Co. v. Citizens for a Better
Env't, 523 U.S. 83, 94-95 (1998)). "[A] federal court, whether
trial or appellate, has a duty to notice a failure of subject-
matter jurisdiction on its own motion at any time during the
proceedings," Nichols v. Agency for Int'l Dev., 18 F. Supp 2d 1,
3 (D.D.C. 1998) (citing Potomac Passengers Ass'n v. Chesapeak &
O. Ry., 520 F.2d 91 (D.C. Cir. 1975)), and if the court concludes
that it does not have jurisdiction over certain claims, those
claims must be dismissed. See Fed. R. Civ. P. 12(h)(3); National
Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1240 (11th
Cir. 2003) (relying on Rule 12(h)(3) in remanding case to the
district court for dismissal of claims over which the district
court lacked subject matter jurisdiction); cf. Allen v. Rehman,
132 F. Supp. 2d. 27, 29 (D.D.C. 2000) ("[A] court must dismiss a
case *sua sponte* at any time if it concludes that it lacks
jurisdiction over the case."); Bogush v. Passiac Police Dept.,

- 5 -

1989 WL 10604, No. 89-0233, *1 (D.D.C. Jan. 31, 1989) ("[I]f the
Court concludes *sua sponte* that it does not have jurisdiction
over [a] lawsuit, . . . the case must be dismissed.").  Because
subject-matter jurisdiction focuses on the court's authority to
hear a claim, a court must "conduct a careful inquiry and make a
conclusive determination whether it has subject matter
jurisdiction or not," 5A Charles A. Wright & Arthur R. Miller,
Federal Practice & Procedure: Civil 2d ("Wright & Miller") § 1350
(1990), by examining the complaint and, "where necessary, . . .
[by] consider[ing] the complaint supplemented by undisputed facts
evidenced in the record, or the complaint supplemented by
undisputed facts plus the court's resolution of disputed facts."
Coalition for Underground Expansion v. Mineta, 333 F.3d 193, 198
(D.C. Cir. 2003).

In August 1999, the DCHRA provided, in relevant part, that
"[a]ny person claiming to be aggrieved by an unlawful
discriminatory practice shall have a cause of action in any court
of competent jurisdiction for damages and such other remedies as
may be appropriate, unless such person has filed a complaint
hereunder[.]"  D.C. Code Ann. § 1-2556(a).[4]  The DCHRA "does not
require exhaustion of administrative remedies before pursuit of a

_____

[4]    Section 1-2556(a) was recodified, without material change,
at D.C. Code Ann. § 2-1403.16(a) (2001).

- 6 -

judicial remedy, but instead 'provides for an *ab initio* election
of remedies.'" Weiss v. International Brotherhood of Elec.
Workers, 729 F. Supp. 144, 146 (D.D.C. 1990) (quoting Anderson v.
United States Safe Deposit Co., 552 A.2d 859, 863 (D.C. 1989)).
"[W]ith certain provisos, the jurisdiction of the [DCOHR] and
this Court are mutually exclusive and a plaintiff must elect
between the filing of a Human Rights Act complaint with the
[DCOHR] and this Court." Hoque v. Roach, 967 F. Supp. 7, 9-10
(D.D.C. 1997); see Weiss, 729 F. Supp. at 146 ("[A] claimant who
files a claim with the [DCOHR] may still file a lawsuit, but only
if the administrative claim is withdrawn prior to the completion
of the [DCOHR's] investigation or if the DCOHR dismisses the
complaint for administrative convenience.") (citations omitted).
Where the DCOHR has dismissed a plaintiff's complaint on the
grounds of administrative convenience, or where the plaintiff has
withdrawn a complaint, the plaintiff maintains all rights to
bring suit as if no complaint had been filed. See D.C. Code Ann.
§ 1-2556(a).

Defendants concede that a charge of age discrimination filed
with the EEOC by a person in the District of Columbia is cross-
filed with the DCOHR pursuant to a worksharing agreement. (See
Defs.' Mot. at 2, 4; Aigret Decl. at Att. 1 and Att. 5.) "When a
worksharing agreement is in effect, claims received by one agency

- 7 -

'shall be deemed received by the other agency . . ..'" <u>Fowler v.
District of Columbia</u>, 122 F. Supp. 2d 37, 42 (D.D.C. 2000)
(quoting 29 C.F.R. § 1626.10(c) (2000)); <u>see</u> 29 C.F.R.
§ 1626.10(c)) (1999).  "Thus, by filing a claim with the EEOC,
the plaintiff commences proceedings with both the EEOC and the
designated state agency . . ..." <u>Fowler</u>, 122 F. Supp. 2d at 42;
<u>see</u> <u>Vitikacs v. The American Legion</u>, No. 02-CA-10202, 2003 WL
22004935, *2-3 (D.C. Super. June 8, 2003).

        When plaintiff filed his November 9, 1999 charge of
discrimination with the EEOC, and indicated on EEOC Form 5 that
he wanted the "charge filed with both the EEOC and the State or
local agency" (Aigret Decl. at Att. 1), he initiated proceedings
with both the EEOC and the DCOHR.  <u>See</u> 29 C.F.R. §§ 1626.7(c)),
1626.10(c)) (1999).  Unlike the EEOC, which conducted and
completed its investigation of plaintiff's age discrimination
claim under the ADEA (<u>see</u> <u>id.</u> at Att. 4), the DCOHR decided only
that it would not initially investigate plaintiff's charge of age
discrimination.  (<u>See</u> <u>id.</u> at Att. 5.)  The DCOHR did not
determine in December 1999 that it was dismissing, closing or not
docketing plaintiff's charge of age discrimination (<u>see</u> <u>id.</u>), and
defendants offer no evidence to establish that the agency
dismissed plaintiff's charge of age discrimination for
administrative convenience or reached any conclusion on the

- 8 -

merits, whether as a result of the EEOC's investigation[5] or its
own investigation.  Moreover, plaintiff has not offered any
evidence that he withdrew his charge of age discrimination from
the DCOHR.  Because the evidentiary record reflects neither any
final agency action by the DCOHR with respect to plaintiff's
charge of age discrimination, nor plaintiff's withdrawal of his
charge from the DCHOR, plaintiff's age discrimination complaint
remains pending with the DCOHR.[6]  See Vitikacs, 2003 WL 22004935

---

[5]    Also, defendants do not offer any evidence to suggest that
the EEOC informed the DCOHR that the EEOC dismissed plaintiff's
age discrimination claim and the bases for the dismissal, or that
the DCOHR was aware that the federal agency had taken such
action.

[6]    Defendants' motion to dismiss plaintiff's age discrimination
claim as having been filed beyond the limitations period argues
that the claim did not remain pending before the DCOHR after
December 1999 because the agency did not assume jurisdiction over
plaintiff's charge by initiating an investigation.  (See Defs.'
Mot. at 4.)  To support this argument, defendants rely on the
EEOC's implementing regulations for Title VII of the Civil Rights
Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq. (2000), and
for the Americans with Disabilities Act of 1990 ("ADA"), 42
U.S.C. § 12101, et seq. (2000).  (See Defs.' Mot. at 4-5 (citing
29 C.F.R. § 1601.13 (1999)).)  The EEOC's Title VII and ADA
implementing regulations contain a provision conferring a 60-day
period of exclusive jurisdiction on the local fair employment
practice agency, here the DCOHR, "to process allegations of
discrimination" under Title VII and the ADA before the EEOC "may
commence processing the allegation of discrimination."  See 29
C.F.R. § 1601.13(a)(1)(ii).  Defendants therefore argue that the
DCOHR's failure to initiate an investigation in the 60-day period
provided by § 1601.13 constituted a waiver of all jurisdiction
over plaintiff's charge of age discrimination.  (See Defs.' Mot.
at 4-5.)  Although a similar argument has been rejected by the
Superior Court of the District of Columbia as being

- 9 -

at *3 ("[N]othing in the statutory language [of the DCHRA]

suggests that a complaint cross-filed with the DCOHR should not

_____

"unjustifiably inflexible and inconsistent with the [DCHRA's] statutory language and intent," Vitikacs, 2003 WL 22004935 at *3 n.2, even if true, defendants fail to explain how the Title VII and ADA implementing regulations apply to plaintiff's charge of age discrimination at issue here, which would be governed by the EEOC's implementing regulations for the ADEA.

Unlike the implementing regulations for Title VII and the ADA, the ADEA implementing regulations do not contain a 60-day exclusive jurisdiction provision. Under the implementing regulations for the ADEA, the EEOC "may process any charge at any time, notwithstanding provisions for referral to and from appropriate State agencies." 29 C.F.R. § 1626.9. And a complainant may file, and the EEOC may process and investigate, a charge of discrimination even if the local agency has terminated its local proceedings. See id. at § 1626.7 ("[A charge of discrimination] shall be filed with the [EEOC] or its designated agent within . . . 300 days of the alleged discriminatory action, or 30 days after receipt of notice of termination of State proceedings, whichever is earlier."). The plain language of the EEOC's ADEA implementing regulations make clear that the EEOC may initiate dual agency action at any time, or may conduct its own investigation, notwithstanding any action taken by a local agency. It would be anomalous to find that, whereas the EEOC may investigate claims of discrimination arising under federal law at any time, the DCOHR may not do likewise with respect to cross-filed discrimination claims which implicate local laws.

Further, because plaintiff asserts a claim for age discrimination, and not a cause of action under Title VII or the ADA, a finding that plaintiff's age discrimination claim remained pending with the DCOHR is not inconsistent with the unpublished opinion in Griffin v. the Acacia Group, No. 97-2816, 1998 U.S. Dist. LEXIS 10854 (D.D.C. July 13, 1998), which relied on Title VII's 60-day deferral period in deciding that the plaintiff's sex discrimination claim in that case was not pending before the DCOHR after the EEOC began its investigation. Id. at *12-13. No such deferral period applies to age discrimination claims. See 29 C.F.R. § 1626.9.

- 10 -

be deemed to be 'pending' before the DCOHR simply because the EEOC takes the lead in the investigation of the complaint. Common usage and understanding of the term 'pending' is fully consistent with the Court's conclusion that a complaint filed with the DCOHR remains pending before the agency until it is withdrawn, dismissed for administrative convenience, or resolved on the merits."). Accordingly, this court does not have subject matter jurisdiction over plaintiff's DCHRA age discrimination claim. Anderson, 552 A.2d at 863; Hogue, 967 F. Supp. at 9-10; see Weiss, 729 F. Supp. at 146.

Because the court does not have subject matter jurisdiction over plaintiff's DCHRA claim, that claim will be dismissed without prejudice to plaintiff seeking leave when and if appropriate to further amend his complaint to reallege his DCHRA age discrimination claim, and to assert facts which establish its timeliness and the existence of subject matter jurisdiction over that claim in this court.

CONCLUSION AND ORDER

Plaintiff's charge of age discrimination, cross-filed with the DCOHR on November 9, 1999, remains pending with the DCOHR. Consequently, this court is without subject matter jurisdiction over plaintiff's DCHRA claim. Therefore, it is hereby

- 11 -

ORDERED that defendant's motion to dismiss, or in the alternative for summary judgment [#3], be, and hereby is, GRANTED in part.  Count I of plaintiff's amended complaint is hereby DISMISSED without prejudice.

SIGNED this 15th day of April, 2004.


_____
RICHARD W. ROBERTS
United States District Judge